# LOUISVILLE AND NASHVILLE RAILROAD COMPANY *v.* MOTTLEY.

No. 246. Submitted January ·9, 1911.—Decided February 20, 1911.

The intent of Congress is to be gathered from the words of the act according to their ordinary acceptation, and the act should be construed in the light of circumstances existing at the time it was passed. Personal hardships cannot be considered; nor can the court mold the statute to meet its views of justice in a particular case.

The court must have regard to all the words used by Congress in a statute and give effect to them as far as possible; and the introduction of a new word into a statute indicates an intent to cure a defect in, and suppress an evil not covered by, the former law.

The prohibition of the act of February 4, 1887, c. 104, § 2, 24 Stat. 379, as amended by the act of June 29, 1906, c. 3591, 34 Stat. 584, against a carrier charging a different compensation·from that specified in its published tariff extends to the granting of interstate transportation by carriers as compensation for injuries, services, advertising or property; the statute means that transportation shall be paid for by all alike and only in cash.

The purpose of Congress in enacting the amendatory act of June 29, 1906, was to cut up by the roots every form of discrimination in rates, not specially excepted, and the act applied to existing contracts and rendered those which were discriminatory illegal.

The court cannot on equitable grounds add an exception to the classes to which a statute clearly applies if Congress forbears to do so.

The power of Congress to regulate commerce among the States and with foreign nations is complete and unrestricted except by limitations in the Constitution itself, and extends to rendering impossible

the enforcement by suit of contracts between carriers and shippers although valid when made.

The power of Congress to act in regard to matters delegated to it is not hampered by contracts made in regard to such matters by individuals; but contracts of that nature are made subject to the possibility that even if valid when made Congress may by exercising its power render them invalid.

An 'act of Congress rendering contracts in regard to interstate commerce invalid does not infringe the constitutional liberty of the citizen to make contracts; and an act, otherwise constitutional, is not unconstitutional under the Fifth Amendment, as taking private property without compensation, because it invalidates contracts between individuals which conflict with the public policy declared in the act.

After the enactment of the act of June 29, 1906, it was unlawful for a carrier to issue interstate transportation in pursuance of a prior existing contract to do so as compensation for injuries received, and, even though valid when made, such a contract cannot now be enforced against the carrier by suit.

133 Kentucky, 652, reversed.

THE facts, which involve the construction of provisions of the Interstate Commerce Act relating to payment of fares on railways, are stated in the opinion.

*Mr. Henry L. Stone* for plaintiff in error:

The object of the act of June 29, 1906, was to prevent discrimination, and to place all passengers and shippers on the same level, with equal rights and privileges. While Congress may not pass an act for the purpose of impairing the obligation of specific contracts, it may in the due exercise of the powers expressly conferred upon it, incidentally do so. *Legal Tender Cases*, 12 Wall. 550; *Bullard v. Northern Pacific Ry. Co.*, 10 Montana, 168. See also 8 Cyc. 997; *Newport News Co. v. McDonald Brick Co.*, 109 Kentucky, 408; *Fitzgerald v. Construction Co.*, 59 N. W. Rep. 862; *Southern Wire Co. v. St. Louis Bridge Co.*, 38 Mo. App. 191; *Fitzgerald v. Grand Trunk R. R. Co.* (Vt.), 22 Atl. Rep. 76, 77. These foregoing decisions

were rendered prior to the passage of the Hepburn Bill of June 29, 1906, and, of course, apply with still greater force since that act took effect. The power of Congress to regulate commerce is paramount and is unrestrained, except by the limitations in the Constitution upon its authority. *Gibbons* v. *Ogden,* 9 Wheat. 1; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 228; *Scranton* v. *Wheeler,* 179 U. S. 162. The only limitation prescribed by the Constitution is that the laws enacted by Congress to carry into execution this power shall be necessary and proper. That is a question wholly and exclusively within the province of Congress to determine. *Kentucky Bridge Co.* v. *L. & N. R. R. Co.,* 34 Am. & Eng. R. Cas. 630; *S. C.,* 37 Fed. Rep. 567. As to what is a vested right in the constitutional sense, see Cooley, Const. Lim., 7th ed., 509; *Bradford* v. *Jenkins,* 41 Mississippi, 328, 335. Due process of law as used in the Fifth Amendment includes not only the established mode of procedure in the courts, but also legislative acts within constitutional powers. Cooley, Const. Lim., 7th ed., 502; 3 Words and Phrases, 2228. Where no exception is made in terms, none will be made by mere implication or construction. *Rhode Island* v. *Massachusetts,* 12 Pet. 892; *Dartmouth College* v. *Woodward,* 4 Wheat. 494. For the court to go beyond that limitation is not to construe, but to legislate. See *Armour Packing Co.* v. *United States,* 209 U. S. 56; Endlich on Statutes, §§ 4–8; *Mottley* v. *L. & N. R. R. Co.,* 150 Fed. Rep. 406; *United States* v. *Dickson,* 15 Pet. 141–163; *United States* v. *Wells-Fargo Express Co.,* 161 Fed. Rep. 606.

Interstate passenger transportation must be paid for in money. Decisions of Interstate Commerce Commission relative to Railroad Passes and Free Transportation, Sen. Doc., No. 226, 60th Cong., 1st Sess., February 6, 1908, p. 18; Conference Rulings of Interstate Commerce Commission, December 28, 1909, p. 57; *C., B. & Q. Ry.*

*Co*. v. *United States*, 209 U. S. 90; *Un. Pac. Ry. Co.* v. *Goodridge*, 149 U. S. 690, 691; *Gulf, Colo. &c. Ry. Co*. v. *Hefley*, 158 U. S. 98; *Int. Comm. Comm.* v. *Chesapeake & Ohio Ry. Co.*, 200 U. S. 361; *Texas & Pac. Ry. Co.* v. *Mugg*, 202 U. S. 242; *Texas & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 439; *Poor Grain Co.* v. *C., B. & Q. Ry. Co.*, 12 I. C. C. Rep. 418, 469; *United States* v. *Chicago, I, & L. Ry. Co.*, 163 Fed. Rep. 114; *United States* v. *Atchison, T. & S. F. Ry. Co.*, 163 Fed. Rep. 111; *Atchison, T. & S. F. Ry. Co.* v. *United States*, 170 Fed. Rep. 250; *State* v. *Martyn*, 117 N. W. Rep. 719; *S. C.*, 23 L. R. A. (N. S.) 217; *McNeill* v. *Durham & C. Ry. Co.*, 132 No. Car. 510.

*Mr. Lewis McQuown* and *Mr. Clarence U. McElroy* for defendants in error:

The act of June 29, 1906, does not cover this case and Congress did not intend it to. The sole purpose of the act in this respect was to forbid, under penalty, all carriers from giving free passes, and to forbid, under like penalty, every person not in the excepted class, from using such free passes. The only argument needed is to show that this provision does not touch the facts of this case. Section 6 of the act of 1906 does not cover this case. It was not the legislative intent to fine a carrier from $1,000 to $20,000 for issuing a ticket that had been paid for. If Congress had intended the act to embrace a case like this, it would have said so, and should have said so, and the fact that it did not say so, is evidence conclusive that it had no such purpose. The act of 1906 was never intended to reach a case like the one at bar, and this construction is not only consonant with sound principle, with common sense, and with justice, but it is believed to be fully justified by the facts. See *United States* v. *Kirby*, 7 Wall. 486. All general terms in the statutes should be limited in their application so as not to lead to injustice, oppression or unconstitutional operation, if that be possi-

ble. It will be presumed that the exceptions were intended which would avoid results of that character. *Carlisle* v. *United States,* 16 Wall. 153; *Chew Heong* v. *United States,* 112 U. S. 555; *Holy Trinity Church* v. *United States,* 143 U. S. 457; *Bate Refrigerator Co.* v. *Sulzberger,* 157 U. S. 37; *Market Co.* v. *Hoffman,* 101 U. S. 116; *Brewer's Lessee* v. *Bloucher,* 14 Pet. 78; *Auffm'ordt* v. *Rasin,* 102 U. S. 620; *Cook* v. *United States,* 138 U. S. 181.

The act of June 29, 1906, would not be constitutional if applied to a case like the one at bar and this court could not enforce such a law. Congress has vast power. It is a potent arm of the Government, but it is not omnipotent. When a private citizen has made a lawful contract, has executed that contract fully so far as his obligation is concerned, and has parted with his money or property on the faith of the inviolability of his contract, that contract cannot be confiscated, simply because Congress has power to regulate commerce between the States. *Wilkerson* v. *Leland,* 2 Pet. 657; *Osborne* v. *Nicholson,* 13 Wall. 654; *Railroad Co.* v. *Richmond,* 19 Wall. 584.

MR. JUSTICE HARLAN delivered the opinion of the court.

As the result of a collision in Kentucky of railroad trains belonging to the Louisville and Nashville Railroad Company, which operated various lines extending through that Commonwealth as well as into Tennessee and other States, the plaintiffs Mottley and wife received serious personal injuries. The collision, it is alleged, was caused by the gross carelessness and negligence of the agents and servants of the railroad company.

After the collision the plaintiffs and the company on the second of October, 1871, entered into a written agreement of which the following is a copy:

"The Louisville & Nashville Railroad Company in consideration that E. L. Mottley and wife, Annie E. Mottley,

have this day released said company from all damages or claims for damages for injuries received by them on the seventh day of September, 1871, in consequence of a collision of trains on the railroad of said company at Randolph's Station, Jefferson County, Ky., hereby agrees to issue free passes on said railroad and branches now existing or to exist, to said E. L. Mottley and Annie E. Mottley for the remainder of the present year and thereafter to renew said passes annually during the lives of said Mottley and wife or either of them."

The railroad company adhered strictly to this agreement for many years, but finally refused further to perform it on the ground that the act of Congress of June 29, 1906, amendatory of the act regulating commerce, approved February 4, 1887, made its enforcement illegal. Thereupon Mottley and wife brought suit in the Circuit Court of the United States for the Western District of Kentucky to enforce the agreement and obtained a decree in their favor. 150 Fed. Rep. 406. But upon a direct appeal to this court that decree was reversed and the case was remanded with directions to dismiss the suit for want of jurisdiction. *L. & N. R. R.* v. *Mottley,* 211 U. S. 149; *Metcalfe* v. *Watertown,* 128 U. S. 586; *Tennessee* v. *Union Planters' Bank,* 152 U. S. 454, 459. The grounds upon which the Federal court was held to be without jurisdiction are not important here.

The present action was brought in the Circuit Court of Warren County, Kentucky. The relief sought was that the defendant company be required specifically to execute the above agreement by issuing passes to the plaintiffs for the year 1909 and for every year thereafter so long as the plaintiffs should each live, over all its roads in and out of Kentucky.

The railroad company resists any judgment that would compel it further to perform the agreement sued on. It bases its defense mainly on the commerce act of Congress

of June 29, 1906, which became effective August 28, 1906, 34 Stat. 838, Pt. I, Res. No. 47. By that statute Congress, among other things, provided:

"SEC. 1. . . . No common carrier subject to the provisions of this act shall, after January first, nineteen hundred and seven, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers," except to certain specified persons, the plaintiffs not being within any of the excepted classes.

"SEC. 6. . . . No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs. Feb. 4, 1887, c. 104, 24 Stat. 379; June 29, 1906, 34 Stat. 584, 586, Pt. II, c. 3591.

The act of June 29, 1906, regulating commerce and enlarging the powers of the Interstate Commerce Commission, made its provisions applicable to "any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad . . . from one State or Territory of the United States or the District of Columbia, to any other State or Territory of the United States or the District of Columbia, etc.;" and in this respect it has not

been amended. It also provides that a common carrier
violating the clause forbidding it after January 1, 1907,
directly or indirectly to issue or to give any interstate free
ticket, free pass or free transportation for passengers
should pay to the United States a penalty of not less than
$100 nor more than $2,000. Any person (other than those
of the excepted classes) who used any such interstate free
ticket, free pass or free transportation became subject to a
like penalty. *Ib.* 585, § 1.

The state circuit court, giving the relief asked, by its
judgment required the railroad company to issue to the
plaintiffs and to each of them a pass over its lines and
branches for the year 1909, and thereafter to renew such
passes annually during their respective lives.

Upon appeal to the Court of Appeals of Kentucky that
judgment was affirmed. *L. & N. R. R. Co.* v. *Mottley*, 133
Kentucky, 652.

It may be, as suggested, that a refusal to enforce the
agreement of 1871 will operate as a great hardship upon
the defendants in error. But that consideration cannot
control the determination of this controversy. Our duty
is to ascertain the intention of Congress in passing the
statute upon which the railroad company relies as pro-
hibitive of the further enforcement of the agreement in
suit. That intention is to be gathered from the words of
the act, interpreted according to their ordinary accepta-
tion, and, when it becomes necessary to do so, in the light
of the circumstances as they existed when the statute was
passed. *Platt* v. *Union Pacific R. R. Co.*, 99 U. S. 48, 64.
The court cannot mold a statute simply to meet its views
of justice in a particular case. Having, in the mode in-
dicated, ascertained the will of the legislative department,
the statute as enacted must be executed, unless found to
be inconsistent with the Supreme Law of the Land.

In our consideration of the case it will be assumed—
indeed the parties themselves assume—that the agree-

ment of 1871 was not when made in conflict with the Constitution or laws of the United States. But we must first inquire whether such an agreement, if made after the passage of the original and amendatory commerce acts, would have been valid under those acts. If those acts forbid agreements of that character we must then inquire whether the one in suit can be now enforced simply because it was valid when made.

The act of February 4, 1887 regulating commerce declared it to be an unjust and unlawful discrimination for any carrier subject to the provisions of that act, directly or indirectly, by any special rate, rebate, drawback or other device, to charge, demand, collect or receive from any person or persons "a greater or less compensation" for any service rendered or to be rendered in the transportation of passengers or property than was charged, demanded, collected or received from any other person or persons for doing him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions. 24 Stat. 379, c. 104, § 2. But the act of June 29, 1906 made a material addition to the words of the act of 1887; for, it expressly prohibited any carrier, unless otherwise provided, to demand, collect or receive "a greater or less *or different* compensation" for the transportation of persons or property, or for any service in connection therewith, than the rates, fares and charges specified in the tariff filed and in effect at the time. We cannot suppose that this change was without a distinct purpose on the part of Congress. The words "or different," looking at the context, cannot be regarded as superfluous or meaningless. We must have regard to all the words used by Congress, and as far as possible give effect to them. *Market* v. *Hoffman*, 101 U. S. 112, 115. The history of the acts relating to commerce shows that Congress, when introducing into the act of 1906 the word "different," had in mind the pur-

pose of curing a defect in the law and of suppressing evil practices under it by prohibiting the carrier from charging or receiving compensation except as indicated *in its published tariff*. 11th Ann. Rep. Interstate Com. Com., 141; 19th *Ib*. 78, 15; 40 Cong. Rec. Pt. 7, p. 6608; *Ib*. 6617; *Ib*. 7428, 7434; Rept. of Confer. Com., 40 Cong. Rec. 9522; 42 Cong. Rec. Pt. 2, p. 1746.

In our opinion, after the passage of the commerce act the railroad company could not lawfully accept from Mottley and wife any compensation "different" *in kind* from that mentioned in its published schedule of rates. And it cannot be doubted that the rates or charges specified in such schedule were payable only in money. They could not be paid in any other way, without producing the utmost confusion and defeating the policy established by the acts regulating commerce. The evident purpose of Congress was to establish uniform rates for transportation, to give all the same opportunity to know what the rates were as well as to have the equal benefit of them. To that end the carrier was required to print, post and file its schedules and to keep them open to public inspection. No change could be made in the rates embraced by the schedules except upon notice to the Commission and to the public. But an examination of the schedules would be of no avail and would not ordinarily be of any practical value if the published rates could be disregarded in special or particular cases by the acceptance of property of various kinds, and of such value as the parties immediately concerned chose to put upon it, in place of money for the services performed by the carrier.

That money only was receivable for transportation is the basis upon which the Interstate Commerce Commission has proceeded; for, in one of its Conference Rulings (207) issued in 1909, the Commission held that nothing but money could be lawfully received or accepted in payment for transportation, whether of passengers or

property, for any service connected therewith, "it being the opinion of the Commission that the prohibition against the charging or collecting a greater or less or *different* compensation than the established rates or fares in effect at the time precludes the acceptance of service, property or other payment in lieu of the amount specified in the published schedules." It is now the established rule that a carrier cannot depart to any extent from its published schedule of rates for interstate transportation on file without incurring the penalties of the statute. *Union Pac. Ry. Co.* v. *Goodridge,* 149 U. S. 690, 691; *Gulf, Col. &c. Ry. Co.* v. *Hefley,* 158 U. S. 98, 102; *I. C. C.* v. *Ches. & Ohio Ry. Co.,* 200 U. S. 361, 391; *Texas & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, 439. That rule was established in execution of a public policy which, it seems, Congress deliberately adopted as applicable to the interstate transportation of persons or property. The passenger has no right to buy tickets with services, advertising, releases or property, nor can the railroad company buy services, advertising, releases or property with transportation. The statute manifestly means that the purchase of a transportation ticket by a passenger and its sale by the company shall be consummated only by the former paying cash and by the latter receiving cash of the amount specified in the published tariffs. In the first of the cases last above cited (the *Goodridge case*) the court, referring to the practice of allowing rebates, said: "So opposed is the policy of the act to secret rebates of this description that it requires a printed copy of the classification and schedule of rates to be posted conspicuously in each passenger station for the use of the patrons of the road, that every one may be apprised, not only of what the company will exact of him for a particular service, but what it exacts of every one else for the same service, so that in fixing his own prices he may know precisely with what he has to compete. To hold a defense thus pleaded to be

valid would open the door to the grossest frauds upon the law, and practically enable the railroad company to avail itself of any consideration for a rebate which it considers sufficient, and to agree with the favored customer upon some fabricated claim for damages which it would be difficult, if not impossible, to disprove. For instance, under the defense made by this company, there is nothing to prevent a customer of the road, who has received a personal injury, from making a claim against the road for any amount he chooses, and in consideration thereof, and of shipping all his goods by that road, receiving a rebate for all goods he may ship over the road for an indefinite time in the future. It is almost needless to say that such a contract could not be supported. There is no doubt of the general proposition that the release of an unliquidated claim for damages is a good consideration for a promise, as between the parties, and if no one else were interested in the transaction, that rule might apply here; but the legislature, upon grounds of public policy, and for the protection of third parties, has made certain requirements with regard to equality of rates which, in their practical application, would be rendered nugatory if this rule were given full effect." That Congress had the constitutional power to adopt such a policy and to prescribe appropriate means to give it effect, we do not doubt.

It is said, however, that as the contract of Mottley and wife with the railroad company was originally valid, it cannot be supposed that Congress intended by the act of 1906 to annul or prevent its enforcement. But the purpose of Congress was to cut up by the roots every form of discrimination, favoritism and inequality, except in the cases of certain excepted classes to which Mottley and his wife did not belong and which exceptions rested upon peculiar grounds. Manifestly, from the face of the commerce act itself, Congress, before taking final action, considered the question as to what exceptions, if any, should

be made in respect of the prohibition of free tickets, free passes and free transportation. It solved the question when, without making any exceptions *of existing contracts,* it forbade by broad, explicit words *any* carrier to charge, demand, collect or receive a "greater or less *or different* compensation" for *any* services in connection with the transportation of passengers or property than was specified in its published schedules of rates. The court cannot add an exception based on equitable grounds when Congress forbore to make such an exception. *Yturbide* v. *United States,* 22 How. 290, 293. The words of the act therefore must be taken to mean that a carrier, engaged in interstate commerce, cannot charge, collect or receive for transportation on its road anything but money. In *Armour Packing Company* v. *United States,* 209 U. S. 56, 81, this court said: "There is no provision excepting special contracts from the operation of the law. One rate is to be charged, and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. There is no provision for the filing of contracts with shippers and no method of making them public defined in the statute. If the rates are subject to secret alteration by special agreement then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart." So, in *Adams Express Co.* v. *United States,* 212 U. S. 522, 532, 533: "But the power of Congress over interstate transportation embraces all manner of carriage of that character—whether gratuitous or otherwise—and, in the absence of express exceptions, we think it was the intention of Congress to prevent a departure from the published rates and schedules in any manner whatsoever. If this be not so, a wide door is opened to favoritism in the carriage of property in the instances mentioned, free of charge. If it is lawful, in view of the provisions of the Interstate Commerce Act, to

issue franks of the character under consideration in this case, then this right must be founded upon some exception incorporated in the act."

It is further said that the passes contemplated by the parties were not strictly free passes; for, it is argued, the railroad company would receive a valuable consideration for each one issued by it. This view is more plausible than sound, and does not meet the difficulty. Suffice it to say, in this case, that such passes, when issued, would be illegal under the act of Congress, by reason of their not being paid for in money, according to the company's schedule of rates, but in consideration only of the release by Mottley and wife of their claim for damages on account of the collision in question.

We now come to the question whether, assuming that the agreement of 1871 was valid when made, could Congress by any statute subsequently enacted make its enforcement by suit impossible? There are certain propositions at the base of this inquiry which we need not discuss at large, because they have become thoroughly established in our constitutional jurisprudence. One is, that the power granted to Congress to regulate commerce among the States and with foreign nations is complete in itself, and is unrestricted except by the limitations upon its authority to be found in the Constitution. *Gibbons* v. *Ogden*, 9 Wheat. 1; *Brown* v. *Maryland*, 12 Wheat. 419; *Addyston Pipe and Steel Co.* v. *United States*, 175 U. S. 211, 229; *Scranton* v. *Wheeler*, 179 U. S. 141, 162, 163; *C., B. & Q. R. R. Co.* v. *Drainage Com'rs*, 200 U. S. 561; *Union Bridge Co.* v. *United States*, 204 U. S. 364, 400; *Atlantic Coast Line &c.* v. *Riverside Mills*, 219 U. S. 186, 202.

In the *Addyston Pipe case*, this court said that, under its power to regulate commerce, Congress "may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corpora-

tions where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any substantial extent interstate commerce."

In the *Scranton* case, where a riparian owner sought compensation from the Government because his access to navigability had been materially obstructed by a pier constructed by the Government on the submerged grounds in front of his land, this court said: "The riparian owner acquired the right of access to navigability *subject to the contingency* that such right might become valueless in consequence of the erection under competent authority of structures on the submerged lands in front of his property for the purpose of improving navigation. When erecting the pier in question, the Government had no object in view except, in the interest of the public, to improve navigation. It was not designed arbitrarily or capriciously to destroy rights belonging to any riparian owner. What was done was manifestly necessary to meet the demands of international and interstate commerce."

In the *Union Bridge Co.* case the question was as to the constitutional authority of the Government to require the Bridge Company to make certain changes or alterations in a bridge across a navigable river of the United States, in Pennsylvania, and which bridge the company owned and constantly used. It was admitted that the bridge had been lawfully erected. But ultimately, in view of the necessities of interstate commerce, it had become an unreasonable obstruction to free, open navigation by vessels and boats then in use, and, for that reason alone, the Government, by its constituted authorities proceeding under an act of Congress, ordered the Bridge Company *at its own cost* to make certain changes and alterations in the structure. This court held that there was no taking of property for public use in the constitutional sense, and that although the bridge when erected under the authority of

Pennsylvania may have been a lawful structure, and although it may not have been an unreasonable obstruction to commerce, *as then* carried on, "it must be taken, under the cases cited and upon principle, not only that the company, when exerting the power conferred upon it by the State, did so with knowledge of the paramount authority of Congress to regulate commerce among the States, but that it erected the bridge *subject to the possibility that Congress might, at some future time, when the public interest demanded,* exert its power by appropriate legislation to protect navigation against unreasonable obstructions."

Long before the above cases were decided it was said in *Knox* v. *Lee,* 12 Wall. 457, 550, 551, that "as in a state of civil society, property of a citizen or subject is ownership, subject to the lawful demands of the Sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the Government, and no obligation of a contract can extend to the defeat of legitimate government authority."

These principles control the decision of the present question. The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations, is inconceivable. The framers of the Constitution never intended any such state of things to exist.

It is said that if Congress intended by the commerce act to embrace such a case as this, then the act is repugnant to the Constitution. Does the act infringe upon the constitutional liberty of the citizen to make contracts? Manifestly not. In the *Addyston Pipe* case (p. 228) above cited, the court said: "We do not assent to the

correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts," relating to interstate commerce. Again: "But it has never been, and in our opinion ought not to be, held that the word [liberty] included the right of an individual to enter into private contracts upon all subjects, no matter what their nature and wholly irrespective (among other things) of the fact that they would, if performed, result in the regulation of interstate commerce, and in the violation of an act of Congress upon that subject. The provision in the Constitution does not, as we believe, exclude Congress from legislating with regard to contracts of the above nature, *while in the exercise of its constitutional right to regulate commerce among the States. . . .* Anything which directly obstructs and thus regulates that commerce which is carried on among the States, whether it is state legislation or private contracts between individuals or corporations, should be subject to the power of Congress in the regulation of that commerce."

These authorities and principles condemn the proposition that the defendants in error had the constitutional right, pursuant to or because of the agreement of 1871 and during their respective lives, to accept and use free transportation for themselves, as passengers, on an interstate train, after Congress forbade, under penalty any interstate carrier to demand, collect or receive compensation for transportation, or any interstate passenger, not within the classes excepted by the act, to use transportation tickets, except upon the basis fixed by the carrier's published schedule of rates. After the commerce act came into effect no contract that was inconsistent with the regulations established by the act of Congress could be enforced in any court. The rule upon this subject is thoroughly established.

It is not determinative of the present question that the commerce act as now construed will render the contract of no value for the purposes for which it was made. In *Knox* v. *Lee*, 12 Wall. 457, above cited, the court, referring to the Fifth Amendment, which forbids the taking of private property for public use without just compensation or due process of law, said: "That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war, may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts."

In *Fitzgerald* v. *Grand Trunk Ry. Co.*, 63 Vermont, 169, 173, which was the case of a contract for the transportation of lumber through several States, the Supreme Court of Vermont said: "Such commerce is solely regulated by Congress, and when parties make contracts to engage in interstate commerce they are held to do so upon the basis and with the understanding that changes in the law applicable to their contracts may be made. There can, in the nature of things, be no vested right in an existing law which precludes its change or repeal, nor vested right in the omission to legislate upon a particular subject which exempts a contract from the effect of subsequent legislation upon its subject matter by competent legislative authority."

In Pomeroy on Contracts, § 280 (Specific Performance), after observing that an illegal contract cannot be made the basis of any judicial proceeding and that no action in law or equity could be maintained upon it, said: "This impossibility of enforcement exists, whether the agreement is illegal in its inception, or whether being valid when

made, the illegality has been created by a subsequent statute." Among the cases cited by the author in support of that view was *Atkinson* v. *Ritchie*, 10 East. 530, 534, in which the Chief Justice, Lord Ellenborough, delivering the opinion of the court, said: "That no contract can properly be carried into effect, which was originally made contrary to the provisions of law, or which being made consistently with the rules of law at the time, has become illegal in virtue of some subsequent law, are propositions which admit of no doubt." In *Kentucky & Indiana Bridge Company* v. *Louisville & Nashville Railroad Co.*, 34 Am. & Eng. R. Cases, 630, Judge Cooley said: "But the act to regulate commerce is a general law, and contracts are always liable to be more or less affected by general laws, even when in no way referred to. . . . But this incidental effect of the general law is not understood to make it a law impairing the obligation of contracts. It is a necessary effect of any considerable change in the public laws. If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable." "If one agrees," said Mr. Parsons, "to do a thing which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise." Parsons on Contracts (6th Ed.), 675.

We forbear any further citation of authorities. They are numerous and are all one way. They support the view that, as the contract in question would have been illegal if made after the passage of the commerce act, it cannot now be enforced against the railroad company, even though valid when made. If that principle be not sound, the result would be that individuals and corporations could, by contracts between themselves, in anticipation

of legislation, render of no avail the exercise by Congress, to the full extent authorized by the Constitution, of its power to regulate commerce. No power of Congress can be thus restricted. The mischiefs that would result from a different interpretation of the Constitution will be readily perceived.

In our opinion, the relief asked by the plaintiffs must, upon principle and authority, be denied; that the railroad company rightly refused, after the passage of the commerce act, further to comply with the agreement of 1871; and, that the decree requiring performance of its provisions, by issuing annual passes, was erroneous.

Whether, without enforcing the contract in suit, the defendants in error may, by some form of proceeding against the railroad company, recover or restore the rights they had when the railroad collision occurred is a question not before us, and we express no opinion on it.

The judgment is reversed, and the cause is remanded for such further proceedings as may be deemed proper, not inconsistent with the views herein expressed.

*Reversed.*