ILLINOIS CENTRAL R. Co. *v.* A. W. HOLMAN.

[63 Soupth. 7.]

1. CARRIERS. *Carriage of passengers. Advertisement for transportation. Federal regulations. Ejection. Right of action. Use of mileage in violation of interstate commerce act.*

It is not in violation of any statute nor of the legislative policy of the state for a railroad in consideration of certain advertising to issue a mileage book to be used only for transportation between points within this state, but not in connection with or as any part of an interstate trip.

106 Miss. 29

2. SAME.

The acceptance of advertising by a carrier in lieu of money in payment of interstate transportation furnished to the publisher, his employees, and the immediate members of his family violates the provisions of the act to regulate commerce of February 4, 1887 (24 Stat. at Large 379, chapter 104, U. S. Comp. Stat. 1901, page 3154) and the acts amendatory thereof, prohibiting the furnishing of interstate transportation for a less or different compensation than that specified in the carrier's published rate.

3. CARRIERS. *Ejection. Right of action. Interstate commerce act.*

Where a mileage book providing that it should be used only for transportation between points entirely within this state, and that it should not be good for any part of an interstate trip, was issued by a railroad to a publisher for advertising, and such publisher intending to go from Grenada, Mississippi to Memphis, Tennessee boarded defendant's train at Grenada and on arriving at Sardis, a point in this state, alighted from the train and bought a ticket from that point to Memphis, Tennessee and such ticket, on his boarding the train, was refused by the conductor unless he would pay cash fare from Genada to Sardis and on his refusal so to do was ejected from the train, such publisher had no action for damages, since he was attempting to use mileage in direct violation of his contract and of the interstate commerce act prohibiting transportation for a less or different compensation than the carriers published rate.

APPEAL from the circuit court of Carroll county.

HON. E. V. HUGHSTON, Special Judge.

Suit by A. W. Holman against the Illinois Central Railroad Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Mayes & Mayes, Blewett Lee* and *R. V. Fletcher,* attorneys for appellant.

*W. S. Hill,* attorney for appellee.

COOK, J., delivered the opinion of the court.

Appellee was the publisher of a newspaper at Vaiden, in this state, and in which it appears that the wife of

appellee was jointly interested. The appellant railroad company entered into a contract with these publishers whereby it was agreed that, in consideration of certain advertising the company would issue certain nontransferable mileage tickets to Mr. Holman and his wife. This contract provided that the mileage books were to be used "only for transportation between points entirely within the state of Mississippi, and must not be used in connection with, or as any part of, an interstate trip." The mileage books issued to and accepted by appellee and his wife had printed on their covers, in black-face type, these words: "Not good for any part of an interstate trip." Appellee and his wife boarded one of appellant's trains at Vaiden, going from there to Grenada, where they changed cars and took another train for Memphis, Tennessee. When the train left Grenada appellee tendered his mileage book to the conductor in charge of the train, stating to him that he was going to Memphis. The conductor informed him that he could not travel from Grenada to Memphis on this mileage. Appellee requested the conductor to carry him as far as he could on the mileage, and asked the conductor to pull the mileage to Sardis, a point in this state about fifty miles from Memphis. It appears that the conductor replied that he would see him after he had worked his train, and after he had finished this duty appellee again tendered his mileage, and the conductor took out mileage to Sardis. When the train reached Sardis appellee got off and purchased tickets from that point to Memphis, reboarded the train, and tendered these tickets to the conductor. The conductor refused to accept the tickets unless appellee would first pay his fare in cash from Grenada to Sardis. Appellee refused to do this, and when the train reached Senatobia, the conductor requested an officer to remove appellee from the train, which was done. Upon these facts, stated most favorably to appellee, this action was instituted, and resulted in a judgment against appellant for the sum

of two thousand seven hundred and fifty dollars. It does not appear that the conductor was rude or insulting in his words or manner, and the only force used was the demand by the officer that appellee leave the train, which appellee says was humiliating to him.

It will be observed that appellee attempted to use his mileage in direct violation of his written contract, and it would seem that he predicated his right of damages upon his own wrong. It must be confessed that, by the terms of his contract, appellee pledged himself not to use his mileage "for any part of an interstate trip." That there was ample reason for limiting the use of the mileage to intrastate trips only will appear later on. Suffice it to say that it is not in violation of the legislative policy of this state for the railroad companies to make contracts like this with publishers of newspapers.

The contract is not condemned by the statutes of this state, and is therefore valid and binding on the contracting parties, and it is difficult to determine that appellee was in a position to demand money from the railroad company for damages which resulted from his effort to force or persuade a minor employee of the company to violate the contract of his master. Good faith is required from parties asking relief in courts of justice, whether the court is administering law or equity, and it seems clear and undisputed that this mileage was issued to and accepted by appellee with the express understanding and agreement that he could not use it in interstate commerce, and that there was a reason why this was so, which must have been within the knowledge of appellee, a publisher of a newspaper, whose duty it would seem requires that he keep posted in all matters affecting the public weal.

*In Chicago, Indianapolis & Louisville Railway Co.* v. *United States,* 219 U. S. 486, 31 Sup. Ct. 272, 55 L. Ed. 305, the supreme court of the United States construing the act of Congress of February, 1903 (32 Stat. 847, ch.

708), regulating commerce with foreign nations, and among the states, as amended by the act of June 29, 1906 (34 Stat. 587, ch. 3591 [U. S. Comp. St. Supp. 1911, p. 1309]), said: ''The decisive question in this case is whether the contract between the railway company and the Munsey Company is repugnant to the acts of Congress regulating commerce. In other words, could the company, in return for the transportation which it agreed to furnish and did furnish to the Munsey publisher over its interstate lines, and to his employees and to the immediate members of his and their families, accept as compensation for such service anything else than money, the amount to be determined by its published schedule of rates and charges? Upon the authority of *Louisville & N. R. Co.* v. *Mottley,* 219 U. S. 467, 31 Sup. Ct. 265 [55 L. Ed. 297, 34 L. R. A. (N. S.) 671], and according to the principles announced in the opinion in that case, the answer to the above question must be in the negative. The acceptance by the railway company of advertising, not of money, in payment of the interstate transportation furnished to the publisher of the Munsey Magazine, his employees and the immediate members of his and their families, was, for the reasons given in the Mottley case, in violation of the commerce act. The facts in the present case show how easily, under any other rule, the act can be evaded and the object of Congress entirely defeated. The legislative department intended that all who obtained transportation on interstate lines should be treated alike in the matter of rates, and that all who availed themselves of the services of the railway company (with certain specified exceptions) should be on a plane of equality. Those ends cannot be met otherwise than by requiring transportation to be paid for in money, which has a certain value, known to all, and not in commodities or services, or otherwise than in money.''

Mr. Holman was an interstate passenger. He boarded the train at Grenada to go to Memphis—his destination

was outside this state. The provisions of the act of
Congress cannot be nullified by evasion, or subterfuge,
nor could the railroad company escape the penalties for
its violation by shutting its eyes to the fact that Mr.
Holman was attempting to pay a part of his fare from
Grenada to Memphis, with mileage issued for advertising
and not paid for in cash. The mere stepping off the
train at Sardis did not change the passenger from an in-
terstate passenger to an intrastate passenger. His *status*
was fixed when he boarded the train at Grenada, and no
part of his transportation could be paid except in money
at the regular tariff rates. This certainly is the contract
between the railroad company and appellee, and the con-
tract is but a declaration of the Federal statute—it could
not have been lawfully made in any other way. The act
of Congress was adopted for the purpose of putting
everybody upon equal terms, and to destroy the perni-
cious practice of discrimination.

Appellee was attempting to violate his contract, and
also to nullify the statutes of the United States. "If
this could be done, then, when the other state was reached,
mileage for that state could be used for some real or
fancied service, and so on, thus defeating the Federal law
entirely. In other words, the person could start from
the state of Louisiana and go to the state of Illinois, using
mileage all the way, only paying fare in crossing the bor-
ders of the states. After crossing the border, he could
use mileage to the last station in that state, paying actual
fare only on crossing the line into another state. This
the supreme court has held cannot be done, but the pro-
visions must be enforced in the same good faith with
which they are enacted, and enforced in such way as to
fulfill the purpose of the law. If this is not done, the
law itself is held in contempt."

*Reversed.*