HUNTINGTON TELEPHONE COMPANY *vs.* THE PUBLIC UTILITIES COMMISSION ET ALS.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued November 9th—decided December 8th, 1933.

*Harold E. Drew,* for the appellants (individual respondents in trial court).

*H. Roger Jones,* Assistant Attorney-General, with whom, on the brief, were *Warren B. Burrows,* Attorney-General, and *Ernest L. Averill,* Deputy Attorney-General, for the appellant (respondent Public Utilities Commission).

*Harrison D. Schofield,* with whom, on the brief, was *David R. Woodhouse,* for the appellee (appellant in trial court).

AVERY, J. December 18th, 1930, twenty-four residents of the White Hills district in the town of Shelton requested the Southern New England Telephone Company to supply them with telephones in their respective residences. February 19th, 1931, it notified the petitioners of its refusal on the ground that the Huntington Telephone Company stood ready to afford the services requested, and that it would cause serious embarrassment to that company if they were supplied by the other. Thereafter, July 15th, 1931, the applicants petitioned the public utilities commission for an order directing the Southern New England to furnish them service through its Derby exchange. The matter was duly heard by the commission September 10th, 1931, which found that lines already supplying patrons in the White Hills district could be extended to all of the petitioners at the regular rates applicable to the Derby exchange. The commission also found that practically all of the business contacts of the petitioners were with establishments in that part of Shelton and Derby served by the Southern New England; and, further, that the petitioners had little occasion for business or social contact with people in the village of Huntington (that part of Shelton outside of the White Hills district served by the Huntington Company); that the consequent value and convenience to the petitioners of the direct telephone service in Shelton and Derby require that they have extended to them that of the Southern New England as requested in their petition. The commission also held that since the evidence disclosed that the petitioners naturally belong in the Derby exchange of that com-

pany and can be more economically handled by it than by the Huntington, the former could not, by reason of a contract entered into between it and the Huntington Company, discharge itself from its public utility obligations to supply residents in a part of the territory at which it has already established service; and concluded that public convenience and necessity require that it supply the petitioners at the regular rates applicable in its Derby exchange. From this finding and order of the commission, the Huntington Company brought an appeal to the Superior Court in Fairfield County, claiming that the order was illegal and unreasonable, and would be practically a destruction and confiscation of its property. The Superior Court sustained this appeal and adjudged that the order be set aside.

From the finding of the court, these facts appear: The Southern New England Telephone Company is organized under a Special Act of the General Assembly (9 Special Laws, p. 605), under which it is granted the right to operate telephone exchanges in the towns and villages of the State. The White Hills district is a rural community in the town of Shelton northwest of the city and about the same distance from the business center of Shelton as it is from Huntington Center. The inhabitants are principally engaged in farming and kindred pursuits, their homes being widely separated. Prior to July 9th, 1907, and also at the present time, the Southern New England rendered service to five subscribers in the White Hills district and one in Huntington Center. About this time, various residents of the rural part of the town applied for telephone connection, which it declined to furnish, assigning as a reason that it did not furnish rural service.

To obtain telephone facilities, some twenty residents entered into a contract with the Southern New Eng-

land by which it bound itself, among other things, to furnish the desired station equipment at an annual rental; to divide upon a fixed percentage all receipts for messages passing over its lines originating from the association; and to publish in its directory, without cost, the names of the subscribers to the associated system. The association was to build its own telephone system of a character satisfactory to the Southern New England and establish a switch point to be approved by it for incoming and outgoing calls, and a public toll station for the convenience of the general public, with a charge of five cents for all calls to and from the Huntington exchange over the lines of the Southern New England. The contract made with these individuals as a voluntary association was, by its terms, to continue in force for three years from January 1st, 1907, and thereafter until three months' notice of discontinuance had been given by either party to the other. In 1910, the voluntary association, incorporated under the general laws and with the consent of the other party, assumed the rights, privileges and obligations arising under the agreement. Neither party has exercised its option to terminate.

The territory in which the association operated comprised practically all of the town of Huntington (now Shelton) beginning on a line drawn west and northwest and one mile distant from the borough of Shelton. From time to time petitions have been presented to the Southern New England for service by residents of the White Hills district, their chief complaint being the five cent toll charge. All of these petitions have been denied. On April 23d, 1930, as the result of several complaints regarding the quality of service being rendered in the White Hills district by the Huntington Company, engineers of the public utilities commission submitted a report concerning its physical

properties and equipment. Thereafter, a meeting was had on June 12th, 1930, between the officers of the company and the commission to discuss the condition of the plant and equipment and the rehabilitation of the same required to meet modern requirements. No other phase of the matter having to do with the service or cost thereof to patrons was then discussed.

At the close of the conference, the chairman of the commission told the representatives of the company to proceed with the reconstruction of its physical properties for the purpose of putting its equipment in such condition as to meet present-day demands. It was instructed to report to the commission at regular intervals concerning the progress of the work. Such reports were furnished and accepted by the commission without comment. These clearly indicated that the company was expending a comparatively large sum of money in meeting the requirements and suggestions of the commission. With respect to the White Hills district, every recommendation made by the engineers has been carried out at an expense in excess of $3000, and the service now rendered to the subscribers in that district is with modern equipment and adequate; and there has been no serious complaint with regard thereto since the improvement. In reconstructing its plant, pursuant to the direction of the commission, the company was led to believe that compliance with the suggestions made would insure its being permitted to continue servicing the White Hills district unless some consideration of public welfare or convenience should otherwise dictate.

Of the twenty-four residents of that district who petitioned the Southern New England for connection through its Derby exchange, twelve were subscribers of the Huntington Company; the others were without telephone service. They gave as their reason for seek-

ing to be supplied through the Southern New England system that the Huntington did not satisfy their needs or requirements and was not a logical connection for them; and, when the former refused to grant their application on the ground that it would embarrass the Huntington Company, the petitioners brought their application to the public utilities commission.

Although the trial court has found that the service rendered by the Huntington Company to the petitioners and available to others in the White Hills district is reasonably adequate for their present and immediately future needs, it has also found that the substantial part of their business, official and social, is in the business section of Shelton and that they have virtually no contacts with the village of Huntington.

The capital stock outstanding of the Huntington Company is $1250. In June, 1930, its physical properties were valued at about $9000 for that part exclusive of the White Hills district, and at about $1200 for that district. To carry out completely the recommendations of the engineers of the public utilities commission would involve an expenditure of about $12,000. The total annual gross revenue was $3144, of which amount the sum of $550 is derived from the White Hills district. The area served through the exchange at Huntington Center is about fifteen square miles. The number of subscribers has increased from twenty to one hundred and six at the time of the hearing before the public utilities commission, and at the time of the trial numbered one hundred and five. Of these, fifteen were residents of the White Hills district, of which twelve were among the original petitioners in the proceeding before the commission.

The conclusion of the trial court that the order of the commission was so unreasonable and confiscatory

as to render it illegal was based upon the fact that the Huntington Company had expended $3000 in the White Hills district in meeting the requirements of the commission, which would be largely lost if most of its subscribers there connected with the Southern New England. The court further concluded that the loss of revenue from that district would make it impossible for the company to continue in operation of other territory now served by it, except at rates so prohibitive as to make the continuance of such service impracticable. This conclusion is not supported by the subordinate facts. The prospective loss of gross revenue being $550, the net loss would necessarily be less. As there were ninety-two subscribers outside the White Hills district, of whom the great majority desired to continue with the Huntington, even if these subscribers absorbed the entire loss of gross revenue from White Hills, it would amount to about sixty cents a month each, or less than two cents a day for them to remain with the company, for which they had signified preference. While the subordinate facts show beyond question that the Huntington Company would be subjected to loss if so many of its subscribers in the White Hills district connected with the Southern New England, yet, on the other hand, they do not support the conclusion that its ability to supply its other subscribers in the town would be destroyed. *Minneapolis, St. P. & S. Ste. M. Ry. Co.* v. *Railroad Commission,* 136 Wis. 146, 116 N. W. 905, 17 L. R. A. (N. S.) 821, 823.

The fundamental error of the trial court's reasoning in this case, however, is in the view which it took as to the rights of the Huntington Company. The Southern New England Company, by its charter, was authorized to operate throughout the entire territory. As a public utility, it could not make any contract by

which its power to perform its public function would be impaired. It could not by contract with a group of individuals or another corporation avoid the performance of a duty owed to the public. *State* v. *Hartford & New Haven R. Co.*, 29 Conn. 538, 547; *Ansonia* v. *Ansonia Water Co.*, 101 Conn. 151, 156, 125 Atl. 474; *Chicago Gas Light & Coke Co.* v. *Peoples Gas Light & Coke Co.*, 121 Ill. 530, 13 N. E. 169, 172; *Thomas* v. *West Jersey R. Co.*, 101 U. S. 71, 83; *Oklahoma Gas & Electric Co.* v. *Wilson & Co.*, 146 Okla. 272, 288 Pac. 316; 51 C. J. 6, 7. "One whose rights, such as they are, are subject to State restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter." *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349, 357, 28 Sup. Ct. 529. "Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to defeat the legitimate government authority." *Louisville & N. R. Co.* v. *Mottley*, 219 U. S. 467, 482, 31 Sup. Ct. 265. Although in this particular contract the Southern New England did not in terms agree not to accept additional subscribers within the territory allotted to the Huntington Company, its practice, since the contract was made, has been to decline to do so. By such refusal to discharge its duties upon the part of the Southern New England, the Huntington associates and the company thereafter formed to carry on the contract which they had made could gain no right to an exclusive franchise in the territory covered. Of the two companies operating in the same territory, a resident could select the one most desirable and convenient to himself.

The order of the commission appealed from confiscated no property of the Huntington Company, in

that it had and could have no exclusive franchise in any part of the territory. It follows, further, that the commission was within its powers in ordering the Southern New England to render to the applicants in the White Hills district a service which to them was more convenient and preferable than that afforded by the other company. In granting such application in the exercise of its administrative function the commission cannot be held upon the facts found to have acted arbitrarily, unreasonably, in the abuse of its power, or illegally; and there is, consequently, no basis for interference by the court with the decision of the commission in the premises. *Andover's Appeal,* 113 Conn. 494, 502, 155 Atl. 717; *Modeste* v. *Public Utilities Commission,* 97 Conn. 453, 459, 117 Atl. 494; *Norwalk* v. *Connecticut Co.,* 88 Conn. 471, 478, 91 Atl. 442; *Spencer's Appeal,* 78 Conn. 301, 308, 61 Atl. 1010; *DeFlumeri* v. *Sunderland,* 109 Conn. 583, 585, 145 Atl. 48; *Holly* v. *Sunderland,* 110 Conn. 80, 82, 147 Atl. 300

There is error; the cause is remanded to the Superior Court with direction to dismiss the appeal.

In this opinion the other judges concurred.