655 F.2d 1254
 211 U.S.App.D.C. 24
 MONONGAHELA POWER COMPANY, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Cable Television Assoc., Inc., U. S. Independent
Telephone Association, Upper Peninsula Power Company, Texas
Power & Light Company, GTE Service Corporation, Consumers
Power Company, Intervenors.
GTE SERVICE CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Gulf States Utilities Company, Intervenor.
CONSUMERS POWER COMPANY, a Michigan Corporation, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
 Nos. 80-1390, 80-1483, 80-1490, 80-1499.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 27, 1981.
Decided May 15, 1981.
 
 Charles M. Meehan with whom Shirley S. Fujimoto, Honolulu, Hawaii, was on the brief for Monongahela Power Company, et al., petitioner.
 William H. Bode and Alfred Lawrence Toombs, Washington, D.C., were on the brief for Consumers Power Company, etc., petitioner in 80-1499 and intervenor in 80-1390.
 Richard M. Cahill, Johnstown, N.Y., Richard McKenna, Stamford, Conn., and James R. Hobson, Washington, D.C., were on the brief for GTE Service Corp., petitioner in 80-1483 and intervenor in 80-1390.
 Edward L. Friedman, Thomas M. Eichenberger and Keith E. McClintock, Washington, D.C., were on the brief for AT&T Company, petitioner in 80-1490.
 Jack D. Smith, Washington, D.C., counsel, FCC, with whom Sanford M. Litvack, Asst. Atty. Gen. Dept. of Justice, Daniel M. Armstrong, Associate Gen. Counsel, FCC, John J. Powers, III, and Andrea Limmer, Dept. of Justice, Washington, D.C., were on the brief for respondents.
 Robert R. Bruce, Gen. Counsel, FCC, and Nancy C. Garrison, Dept. of Justice, Washington, D.C., also entered an appearance for respondents.
 
 
 1
 Jay E. Ricks, Washington, D.C., with whom Gardner F. Gillespie, Paul Glist, Washington, D.C., Robert Ross, Brenda Fox, Washington, D.C., and James H. Ewalt were on the brief, for National Cable TV Association, Inc., intervenor in 80-1390.
 
 
 2
 Peyton G. Bowman, III, and Daniel J. Wright, Washington, D.C., were on the brief for Upper Peninsula Power Company and Texas Power and Light Co., intervenors in 80-1390.
 
 
 3
 Thomas J. O'Reilly, Washington, D.C., and Daniel J. Greenwald, III, New York City, were on the brief for United States Independent Telephone Association, intervenor in 80-1390.
 
 
 4
 Peter B. Kelsey, Washington, D.C. was on the brief for Edison Electric Institute, amicus curiae, urging that the order be set aside in 80-1390, 80-1483 & 80-1499.
 
 
 5
 Before WILKEY, WALD and MIKVA, Circuit Judges.
 
 
 6
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 7
 In the Communications Act Amendments of 1978 (Act), Pub.L.No. 95-234, 92 Stat. 33, Congress granted the Federal Communications Commission (FCC) jurisdiction over arrangements for the attachment of a cable television (CATV) system to poles owned or controlled by utility companies. The FCC was directed to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable." Id. § 6 (codified at 47 U.S.C. § 224(b)(1) (Supp. II 1978)). In the present consolidated cases, a number of utility companies petition for review of a set of FCC orders promulgating rules and policies for rate regulation under the Act. In particular, petitioners and intervenors challenge the FCC's determinations that CATV should be regarded as occupying one foot of the usable space on utility poles, that capital costs should be assessed whenever possible on the basis of historical costs rather than replacement costs, and that the Act's provisions for rate regulation apply prospectively to all pole attachments, including those arranged pursuant to contracts made before the enactment of the statute. We uphold the FCC orders.
 
 
 8
 For the first five years of the Act's effectiveness, the FCC is to be guided by a statutory specification of the range of rates that may be considered just and reasonable:
 
 
 9
 (A) rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, not more than an amount determined by multiplying the percentage of the total usable space ... which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole....
 
 
 10
 Act § 6 (codified at 47 U.S.C. § 224(d)(1) (Supp. II 1978)) (emphasis added). The operation of this interim rate system is illustrated by a calculation explicitly worked out in a Senate report:
 
 
 11
 (O)n a typical utility pole 35 feet in length there are 11 feet of usable space (that space above minimum grade level clearance used to attach cable, telephone, and electric wires and associated equipment). By what is virtually a uniform practice throughout the United States, cable television is assigned 1 foot out of the 11 feet of usable space. (While cable only physically occupies approximately 1 inch of this space, the clearance space between CATV and the next adjacent pole user is attributed to CATV.) Cable's share of the total capital costs and operating expenses for the entire 35-foot pole would be one-eleventh.
 
 
 12
 S.Rep. No. 580, 95th Cong., 2d Sess. 20 (1978) U.S.Code Cong. & Admin.News 1978, pp. 109, 128. The FCC's announced procedure for determining whether rates are just and reasonable is consistent with the Senate report's analysis and the industry practice it describes: the FCC has attributed one foot of the usable space to CATV. Petitioners attack this decision as arbitrary and capricious.
 
 
 13
 Petitioners concede that Congress left the FCC broad discretion to determine the amount of space "occupied by the pole attachment" for purposes of the initial implementation of the Act. They argue, however, that the FCC failed to exercise its discretion by erroneously regarding itself as bound by the illustrative example in the Senate report. But the FCC's language, especially that in its final Memorandum Opinion and Order on the subject, 77 F.C.C.2d 187 (1980), demonstrates that the FCC viewed the legislative history as supporting its own reasoning. That reasoning was based in part on industry practice, in part on utility companies' profitable use of the safety clearance space, and in part on the risk of replacement cost that many utility contracts imposed on their CATV lessees. "In sum," the FCC stated, "we conclude that our decision on usable space was not only grounded in the legislative intent, but was also amply justified as an equitable and practical matter in the record before us." 77 F.C.C.2d at 191. We find that the FCC's determination was a conscientious exercise of discretion, and was a reasonable interpretation of the Act, particularly in view of the interim nature of the current regulatory structure.
 
 
 14
 Petitioners attack the FCC's preference for historical cost data in evaluating the reasonableness of rates. The Act does not specify the precise method for calculating "actual capital costs," and the legislative history suggests that Congress intended to give the FCC discretion to decide when historical cost data would be appropriate. "Not wishing to foreclose the Commission from accepting any particular costing methodology, the committee merely seeks to permit the Commission to consider each case on its own merits and according to its own facts." 124 Cong.Rec. 1598 (remarks of Sen. Hollings). The FCC has decided that historical cost data will be preferred, although other approaches will be permitted when historical data are unavailable. Notice of Proposed Rulemaking, 68 F.C.C.2d 3, 11 (1978); Memorandum Opinion and Order, 77 F.C.C.2d 187, 198 (1980). This determination is clearly within the agency's discretion; Congress did not intend to require the FCC to reevaluate the merits of current replacement cost data in every rate case.
 
 
 15
 Finally, intervenors challenge the FCC's authority to apply its regulatory structure to release CATV operators prospectively from contractual arrangements made before the passage of the Act. Intervenors recognize the issue as one of statutory interpretation, and raise no constitutional argument. See Louisville & Nashville R.R. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911).
 
 
 16
 The statute itself is all-encompassing in its wording: the FCC is to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable," and is authorized to "hear and resolve complaints concerning such rates, terms, and conditions." Act § 6 (codified at 47 U.S.C. § 224(b)(1) (Supp. II 1978)). This sweeping language is consistent with the urgings of the Act's sponsors, who were alarmed by "numerous abuses of (the utilities') monopoly power," 123 Cong.Rec. 35,00 6 (1977) (remarks of Rep. Wirth), and who encouraged Congress to "act quickly" for the protection of "consumers now receiving cable television as well as consumers who desire access to this service in the future," id. at 16,694 (remarks of Rep. Wirth). Intervenors point to no evidence whatever that Congress meant to deny the FCC the disputed power.
 
 
 17
 Moreover, this view of the legislative intent is supported by the agency's interpretation of the statute. The FCC concluded that it would be "powerless to act in accordance with its mandate" if it were required to await the expiration of existing contracts before granting relief to CATV lessees. First Report and Order, 68 F.C.C.2d 1585, 1591 (1978).
 
 
 18
 For the reasons stated, we uphold the FCC's orders. The Commission may proceed "to hear and resolve complaints regarding the arrangements between cable television systems and the owners or controllers of utility poles," S.Rep.No. 580, 95th Cong., 2d Sess. 2 (1978), U.S.Code Cong. & Admin.News, 1978, p. 110, including those involving preexisting contracts, using the methods for calculating and apportioning costs that it has prescribed.
 
 
 19
 So ordered.