HAWARDEN SAND & GRAVEL COMPANY, Appellee, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

CARRIERS: Carriage of Goods—Furnishing of Equipment—Special Contracts—Cooperage of Cars. Where there were no provisions for coopering of cars in the tariff schedule filed by a carrier relating to intrastate shipments, and said schedule did provide that "suitable boards will be furnished at all loading stations for use in coopering cars," a shipper could not recover for labor performed and nails furnished which were reasonably necessary to put cars in condition to transport sand and gravel; for, while it is the duty of the carrier to furnish suitable cars, under Section 2116, Code Supp., 1913, the statute does not make the carrier liable for such matters, and it is the duty of the shipper, in such a case, to refuse to accept the cars; and any allowance to the shipper, outside of that for lumber, would be an unjust discrimination, prohibited by Section 2128, Code, 1897.

*Appeal from Sioux District Court.*—WILLIAM HUTCHINSON, Judge.

APRIL 14, 1919.

ACTION at law to recover an amount claimed to be due plaintiff for coopering cars furnished by the defendant to the plaintiff for the purpose of hauling sand and gravel. The cause was tried to the court, and judgment entered for the plaintiff. Defendant appeals. Opinion states the facts. —*Reversed.*

*Van Oosterhout & Kolyn, James C. Davis,* and *George E. Hise,* for appellant.

*Clarence A. Plank,* for appellee.

GAYNOR, J.—This action is brought to recover a certain sum, with interest. The plaintiff bases a right to recover on the fact which the evidence discloses, that it ordered certain cars from the defendant for use in transporting sand and gravel; that the cars furnished, when received by the plaintiff, required coopering, to make them perfectly fit for the purpose of transporting the character of sand that the plaintiff had for transportation; that, to put them in that con-

dition, plaintiff was compelled to do, and did do, a certain amount of coopering. It appears that, in coopering, the plaintiff used lumber furnished by defendant, but did the labor of repairing and furnished the nails. The action is brought to recover for the labor done and the nails furnished and used. The question here, then, is whether the plaintiff is entitled to recover for the labor performed and nails furnished, when the work was reasonably necessary to put the, cars in condition to haul, without waste, the kind of commodity which the plaintiff had for transportation. It is conceded that the sand was loaded in these cars and transported to points wholly within the state of Iowa. It is also conceded that the defendant is a common carrier, and, during the year 1916, was engaged in both interstate and intrastate commerce; that the cars furnished were indiscriminately used by the defendant, both in interstate and intrastate commerce; and that the coopering for which suit is brought was done during the year 1916. The number of cars furnished, used, and coopered is not disputed, and it is conceded that the charges made are reasonable. The cars were furnished and used between the 27th day of May, 1916, and the 11th day of November, 1916. No claim is made for lumber used in coopering the cars. The lumber was furnished by the defendant at the loading station, and was used by the plaintiff in the work of coopering. It is apparent, therefore, that the only question presented for our consideration is whether the company is liable to the plaintiff for the labor performed and the nails furnished in coopering,—that is, in making these cars sand tight. Statements were furnished by the plaintiff to the defendant monthly, and refused by the defendant, on the ground that it could not allow the plaintiff for this coopering, because such work was not provided for in its tariff schedules; that its tariff schedules provided for furnishing lumber only; and that it could not, therefore, rightly allow plaintiff for labor or coopering, or for nails used in coopering.

It was conceded, and, for the purposes of this case, we assume it to be a fact, that certain exhibits, numbered 3, 3-a, 3-b, 4, 5, 5-a, 5-b, 5-c, and 5-d, and Exhibits Nos. 6, 6-a, 6-b, 6-c, and 6-5 are the approved classifications, rules, and regulations promulgated by the defendant company, published, filed with, and approved by, the Interstate Commerce Commission and the Iowa State Railway Commission; and that the same were legally in force and effect during the year 1916, and at all times complained of in the suit in controversy. These schedules fix the tariff rates to be charged, together with classifications, rules, and regulations published by the defendant company and in force during all the time plaintiff claims to have done the coopering.

There is no provision in the tariff so published for the coopering of cars by the company. It does, however, provide that it shall furnish lumber to its shippers for repairing and coopering cars. The tariff schedule reads:

"Suitable boards will be furnished at all loading stations for use in coopering cars."

These tariff regulations are binding on the company, and after being published, all shippers must take notice, and are presumed to have notice, of them. Therefore, we have the published schedule of rates fixed by the company and approved by the commissioners. The only duty which the defendant company assumed to any of its shippers in the published schedules is to furnish the lumber for coopering. That coopering may be necessary, and sometimes is necessary, we may assume. The cars used by the plaintiff were, at the time they were furnished, in condition for the transportation of ordinary commodities, and when not in condition for that purpose, were placed on defendant's repair track and repaired, before delivery to the plaintiff; but the repairs made upon them did not render them sufficiently tight and close to hold the character of sand shipped by plaintiff, without coopering. The evidence showed that the

work done by the plaintiff in coopering was reasonably nec-
essary to make the cars so that they would hold sand and
gravel such as the plaintiff shipped.   The coopering consist-
ed in nailing strips or boards over the holes or cracks in the
cars.   It does not appear where those holes or cracks were,
or their size.   The company furnishes lumber free to the
shipper, so that he may cooper the cars whenever it appears
to the shipper that the condition of the cars is not, by reason
of slight defects, safe for the transportation of his particular
commodity.

These are practically all the facts appearing in the rec-
ord which are necessary to a determination of the real ques-
tion before us.

To recapitulate:   It will be noted that the plaintiff
seeks reimbursement from the carrier for labor and mate-
rial supplied by him in coopering, or making tight against
leakage, cars to be loaded with sand in bulk, shipped from
the loading point to destinations in Iowa.   The entire ship-
ment was intrastate.   Plaintiff does not claim that the tar-
iffs of the carrier lawfully applicable to intrastate traffic,
provided that the carrier would reimburse the shipper for
amounts invested in coopering cars.   Plaintiff relies entire-
ly for recovery upon Section 2116 of the Code of 1897, which
provides:

"Every railway corporation shall, when within its pow-
er to do so, and upon reasonable notice, furnish suitable
cars to any and all persons who may apply therefor, for
the transportation of any and all kinds of freight, and re-
ceive and transport such freight with all reasonable dis-
patch," etc.

It is the claim of the plaintiff that the cars were not
suitable for the transportation of plaintiff's sand, and that,
therefore, defendant failed in its statutory duty in the fur-
nishing of cars, and that this failure justified the plaintiff
in coopering the cars at defendant's expense, so as to make

them suitable for the transportation of the freight which it intended to transport upon the cars.

Before much of the legislation fixing the rights, duties, and obligations of railway companies to shippers and to the public generally, and before the creation of the Iowa Railway Commission and the Interstate Commerce Commission, it was found that railway companies were in the habit of discriminating between shippers and between localities, and these evils of discrimination worked great prejudice to the public. It was, therefore, thought advisable to compel the railway companies to publish terms and conditions under which shipments would be made; so they were required to classify freight and fix rates and regulations, and publish and file the same with the Railway Commission, so that all might be treated alike. The classifications and rates thus fixed are made binding upon the company in its dealing with all shippers. After making the classification and fixing the rates, they are not permitted to discriminate by giving one shipper or one locality an advantage over another. The classifications and rates must be uniform and general, and binding in the territory covered by the classification and rates so fixed and published. It was made a crime for a company to discriminate, or to grant privileges or immunities to one that were not granted to all, by the classification and rates fixed. The classification, rates, and regulations so fixed were presumed to be reasonable; and the courts, in dealing with shippers and carriers, were bound by the regulations so published. If these regulations are thought to be unreasonable or unjust or discriminatory, application must be made to the commission, and the regulations must be by it reviewed, and if found unjust, the company may be forced to do that which is right in the judgment of the commissioners, and to fix rates, classifications, or regulations which are fair and just and reasonable, and not discriminatory. The purpose of the act regulating commerce, while

seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all, and to destroy favoritism; and this purpose was accomplished by requiring the publication of tariffs, and by prohibiting departure from such tariffs, and prohibiting rebates, preferences, and all other forms of undue discrimination. These statutes are remedial, and are to be interpreted so as to accomplish the great public purpose which they are enacted to serve. By them there is a prohibition created against either directly or indirectly charging more or less than the published rates, and this prohibition is made applicable to every method of dealing by a carrier by which the forbidden result can be brought about. Any method adopted by which discrimination against shippers can be effected is condemned, and in Armour Packing Co. v. United States, 209 U. S. 56, it was said:

"The Elkins Act proceeded upon broad lines, and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service, under the same conditions, should be the one established, published, and posted as required by law. It is not so much the particular form by which or the motive for which this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates, duly posted and published."

This authority we cite for the purpose of showing that the railroad company is bound by its published tariffs; that it cannot, directly or indirectly, grant concessions or favors to any shipper that are not included in its published rates as concessions and favors to all, and for the further reason that any express contract made by a shipper to secure to itself an advantage over other shippers is absolutely void. It follows that, if the contract cannot be expressly made, the law will not imply such a contract and enforce it. The rates,

classifications, and regulations fixed and published by the company are binding upon the company and the shippers, as long as they remain unchallenged. They are presumed to be fair and reasonable. If they are thought unfair or unreasonable, or discriminatory, the law provides a method for their correction, and that is by application to the Interstate Commerce Commission, if affecting interstate commerce, or to the Railroad Commission of Iowa, if affecting intrastate commerce. No railroad company can grant to a shipper, and no shipper can demand of the railroad company, more than in its published rates it has declared a purpose to grant to all. This rule is absolutely essential to secure uniformity, and to avoid unjust discriminations. As bearing upon this point, see *Armour v. United States,* supra; *Louisville & Nashville R. Co. v. Mottley,* 219 U. S. 467; *Cincinnati, N. O. & T. P. R. Co. v. Rankin,* 241 U. S. 319; *Loomis v. Lehigh Valley R. Co.,* 240 U. S. 43.

The tariff schedule submitted to us here, which, it is claimed, governs the rights of the parties in this suit, makes no provision requiring the company to cooper any of the cars furnished to a shipper and accepted by it. All it agrees to do is to furnish the lumber for coopering. This, then, is the rule announced by the company to all shippers, and it limits the duty of the company and the rights of the shipper. The company is not only not bound to do more than its published schedule requires it to do, but it is prohibited from granting to any shipper a concession that it has not disclosed its purpose to grant to all, nor can any shipper enforce a claim for more than the published schedule grants to all. He is presumed to have accepted the services of the defendant upon the terms provided in the published tariff schedule, and any contract to do other or differently than is provided in that schedule is void as being discriminatory, and against the purpose and policy of the law. See *Chicago & A. R. Co. v. Kirby,* 225 U. S. 155; *Chicago, R. I. & P. R.*

*Co. v. Cramer*, 232 U. S. 490; *Kansas City So. R. Co. v. Carl*, 227 U. S. 639; *Atchison, T. & S. F. R. Co. v. Robinson*, 233 U. S. 173; *Phillips v. Grand Trunk W. R. Co.*, 236 U. S. 662.

But it is contended by the plaintiff that the defendant failed to perform a *statutory duty;* that its statutory duty is to furnish *suitable* cars for the transportation of plaintiff's commodity; and that the cars were not suitable for that purpose. Whether these cars were suitable for the shipment of the particular commodity which plaintiff desired to ship in the cars, was a matter open to the plaintiff upon inspection. It received the cars for the purpose for which it desired to use them. It might have refused the cars, if they did not meet its needs. When it accepted the cars, it accepted them as complying with the requirements of the statute, knowing—because it is presumed to know the tariff schedule—that the company had only agreed to furnish the lumber for coopering, in the event the cars needed coopering. Before the plaintiff used the cars, it discovered that they needed coopering. It took the lumber, which defendant furnished for that purpose, and proceeded to do the coopering or repairing. It accepted the cars, knowing that they needed coopering, and it accepted them under the terms of the published tariff rate, knowing that they needed coopering, and that the defendant had only agreed to furnish the lumber for that purpose.

The schedules introduced in evidence were those relating to interstate commerce. It was stipulated that these rules and regulations were published by the defendant company, and filed with and approved by both the Interstate Commerce Commission and the Iowa State Railway Commission, and that the same were legally in force and effect during all of the year 1916. These shipments, however, were intrastate. The rule regulating interstate traffic may be regarded as applicable to Iowa intrastate traffic, either by pub-

lication, under Section 2128 of the Code, or by virtue of Rule 36 of the Iowa Classification No. 15, which requires the application to Iowa intrastate traffic, of carriers' rules, regulations, and classifications, as the same are published by the carriers in Circular No. 1 of Western Trunk Lines, when making lower rates than the board's schedule of reasonable maximum rates and classifications of freights, or when of advantage to the shipper. The board's schedule and classification, in and of itself, makes no provision as to coopering cars, so that even a provision for furnishing lumber is of advantage to the shipper. In Circular No. I-l and I-m of Western Trunk Lines, in effect during 1916, it was provided that suitable boards would be furnished for coopering cars at loading stations. It appears that the schedule stipulated as being in force during the year 1916 was filed with the Iowa Railway Commission. It is not shown that any other rates were filed or published. The stipulation in the case— and we take it as a fact—is that intrastate shipments, that is, shipments in Iowa, are governed by the rules concerning which the stipulation is made, and which, it appears, are filed with the Iowa Railway Commission.

Section 2128 provides:

"When any such common carrier shall have established and published its rates, fares and charges, it shall not charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares and charges as may at the time be in force. Every common carrier subject to the provisions of this chapter shall file with the board of railroad commissioners copies of its schedules of rates, fares and charges established and published, and shall promptly notify said. board of all changes made in the same."

We recognize, as a rule governing the rights of these

parties, that it was the duty of this carrier to furnish cars suitable to transport in safety all traffic which they held themselves out to carry. This is not only a statutory duty, but a common-law duty. Its duty is to furnish cars reasonably safe for carrying the commodity which it advertises itself to carry. If the car furnished requires much repairing, if its door posts are shattered or broken, or if it has holes or cracks through which the commodity would sift in transit, the shipper may refuse to accept it as complying with the requirements of the law governing the duty of a carrier. If the cars furnished are not sufficient for the purpose, it is the duty of the carrier promptly to furnish suitable cars on demand. The shipper is not bound to receive and load cars upon which he must expend labor and material to make them suitable to transport his commodity. Before carriers were placed under the jurisdiction of the Commerce Commission, and before they were required to publish rates and classifications of freights, and rules and regulations, and the terms on which they would deal with all shippers, repairing was charged to the carrier, and great difficulty and confusion arose in adjusting the claims of shippers against carriers for these repairs. It was then thought advisable, and the commissioners so held, that a maximum rate should be fixed per car to be paid the shipper for repairs. This maximum rate included all the expense incurred in coopering and repairing, and the material furnished in doing the work, and they were required to state the maximum amount that they would allow a shipper for this work, and that maximum rate governed and applied to all shippers, and was uniform and not discriminatory; and it was said that, upon fixing the maximum rates, it should declare distinctly and clearly in its schedule just what would be furnished at the expense of the carrier. So it was held that a carrier, in fixing its schedule of rates, should fix the maximum amount that it would allow, or what it would do in

the way of furnishing material for repairing or coopering.' If it furnished loose boards at one point, and at another point sectional doors, lath, paper, or burlap, it was guilty of unlawful discrimination.

We find in this case that, under the tariff schedule which it is agreed was in force during 1916, defendant had bound itself to furnish only lumber to its shippers in coopering cars. To allow this plaintiff more than the defendant had agreed in its schedule to allow all shippers, would necessarily be discrimination in favor of this plaintiff, and not tolerable under the law, or the policy upon which the law rests. The company having furnished the lumber which, under its schedule, it had agreed to furnish, it had performed its full duty. When this shipper received the cars for the purpose of transportation, and found it necessary to repair or cooper them to meet the requirements of transportation of its particular commodity, it could have refused to accept them. If it accepted and retained them as they were, it could avail itself of the lumber which, under the tariff schedule, the defendant had furnished, and if more was required, bear the burden of it. Otherwise, there would be an unjust discrimination in this: The company would be furnishing more to plaintiff than it had agreed in its tariff schedule to grant to all carriers.

We think the court was wrong in holding the defendant liable for the labor done and nails used by this plaintiff in coopering the cars, and the cause is, therefore,—*Reversed.*

LADD, C. J., EVANS and STEVENS, JJ., concur.