## NORTHERN PAC. RY. CO. v. ST. PAUL & TACOMA LUMBER CO.

(Circuit Court of Appeals, Ninth Circuit. February 24, 1925. Addenda to Opinion April 6, 1925.)

No. 4251.

1. Carriers ⬅️35—Contract by lumber company to ship a stated proportion of its product over the lines of a railroad company held valid.

A contract made in 1888 by a manufacturer of lumber to ship a certain proportion of its product over the lines of a railroad company, which implied an agreement by the railroad company to furnish cars for such shipments, was not invalid as in violation of Interstate Commerce Act, §§ 2, 3 (Comp. St. §§ 8564, 8565), prohibiting discrimination and undue preferences, as requiring the company to furnish the cars regardless of the rights of other shippers, but its obligation is to be construed as one to furnish cars on reasonable and lawful demand therefor.

2. Carriers ⬅️12(1)—Contract for special rate held subject to action by state authorities changing lawful rate but not destroyed by such action.

A contract by a railroad company to transport logs for a lumber company at an agreed rate is subject to the action of state authorities changing the lawful rate on such shipments, and is not destroyed by such action, but its terms are modified as was presumably contemplated by the parties.

3. Carriers ⬅️12(1), 24—Contract for special rate held subject to regulatory power of national and state governments.

A contract by a railroad company to transport logs for a lumber company at an agreed rate, though made in connection with a sale to the lumber company of the land from which the logs were to be cut, and for the purpose of securing increased lumber traffic, held subject to the regulatory power of the national and state governments over rates.

4. Commerce ⬅️85 — Interstate Commerce Commission has power to prevent undue discrimination against interstate commerce by intrastate rates.

The authority vested in the Interstate Commerce Commission by Transportation Act 1920 extends to the removal of undue, unreasonable, and unjust discrimination against interstate commerce by an order fixing intrastate rates for the purpose.

5. Contracts ⬅️303(2)—Damages for breach not recoverable, where performance was rendered impossible by subsequent legislation.

Where performance of a contract by a railroad company to transport logs for a lumber company at an agreed rate was made impossible by the action of state authorities in establishing a higher rate, it cannot be held liable on the contract for the lawful rate collected in excess of the contract rate.

6. Contracts ⬅️261(5)—Party held entitled to be relieved in equity from liability for breach.

Where one party to a contract waived defaults by the other party, it is entitled to be relieved in equity from liability for a subsequent unavoidable breach on its own part which would not have occurred if the other party had performed the contract within the time required by its terms.

7. Contracts ⬅️321(1)—Basis for accounting between the parties to a contract stated.

Basis of accounting stated under a contract by which a railroad company sold timber and lands to a lumber company and the latter agreed to cut and manufacture the timber and ship a stated proportion of the lumber over the railroad company's lines.

Appeal from the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Suit in equity by the St. Paul & Tacoma Lumber Company against the Northern Pacific Railway Company. From the decree, both parties appeal. Reversed and remanded.

For opinion below, see 296 F. 749.

On May 2, 1888, the railway company and certain persons, predecessors of the lumber company, made a contract now the subject of this litigation. After numerous recitals, the covenants are:

(1) The company sells to the purchasers, for the price and on the terms and conditions thereafter named in the contract, all the merchantable timber of the kind specified then standing upon the lands described then available or which, by the building of the railroad or other customary means, could be made available or accessible at 50 cents per thousand feet, board measure, stumpage for all such timber.

(2) The company agrees to sell the lands, not exceeding 80,000 acres, for $1.25 per acre, after the timber sold has been cut.

(3) The purchasers were to pay for the timber and lands $3 per acre, one-fifth immediately on ascertaining the acreage, and the balance in four annual installments. The difference between the $3 per acre and $1.25 per acre should be applied as payment on the timber. The remainder of the purchase price of the timber was to be paid by the purchasers constructing a railroad from Orting, southerly, to be known as the Tacoma, Orting & Southeastern Railroad; but, if the cost of the railroad should exceed the amount due for the timber purchased, plus 10 per cent., the railroad company agreed to reimburse the purchasers by crediting them with

half the freights for carrying the purchasers' logs.

\*     \*     \*     \*     \* ·

(5) Purchasers were to erect a sawmill of a prescribed capacity "to cut lumber for eastern and local markets," and in each year after 1889 to cut on the lands at least 75,000,-000 feet of timber and ship the lumber manufactured therefrom over the Northern Pacific Railway as provided.

(6) The company agreed to transport logs of the purchasers cut on said lands "or upon adjacent lands of the purchasers, when delivered free on board the cars of the company at any point or points on said railroad to be constructed as aforesaid, or on the Cascade division of the Northern Pacific Railroad, south of the crossing of Green river, or any other road or branch that may be constructed on or through said lands and operated by the company to Tacoma, at the rate of $1 per thousand feet, board measure, company furnishing all rolling stock and the purchasers to load and unload the cars."

(7) Purchasers agreed to ship at least 60 per cent. of the lumber manufactured from the timber cut on the lands to points east on the Northern Pacific Railroad, and beyond, provided the company would, "so far as it lawfully may, fix such rates and charges for transportation as will enable the purchasers to compete in the interior and Mississippi Valley lumber markets, with the lumber districts of Minnesota and Wisconsin; and, further, in case rates and charges of the company for such transportation and the cost of manufacturing and marketing such lumber will not enable the purchasers to compete in said markets and afford them a profit of 15 per cent. on the actual cost on cars at the mill of the lumber so shipped and transported to interior and Mississippi Valley markets, then in such case, while that condition or state of things exists, the purchasers shall not be obliged to cut any timber on said lands except at their own option, but in no event while such condition or state of things exists shall they cut on said lands more than 40,000,000 feet per annum."

\*     \*     \*     \*     \*

(9) When the purchasers have fully performed their agreement, including the obligation of manufacturing the timber into lumber and shipping it as provided in the contract, the company agreed to convey in fee simple the lands which have been cut over.

The lumber company alleges full compliance with the contract, and avers that on July 1, 1918, the railroad company put in effect a tariff substantially increasing the charge of $1 per thousand feet, and has refused to comply with the contract. The prayer is for an accounting to determine damages sustained by the breach of the rate term of the contract since July 1, 1918, for injunction to restrain the railway company from collecting more than $1 per thousand feet, and, should injunction be denied, then, in place of the remedy of specific performance, that the lumber company have an accounting to determine damages already sustained and damages which it would sustain because of the breach of the contract with respect to the $1 rate; that, if specific performance and compensation by way of damages are denied, then that the lumber company be decreed to have performed the contract and entitled to the unincumbered use of the lands and property described and to conveyances free from any claim of the railway company, requiring the lumber company to manufacture and ship the lumber over the lines of the defendant company.

By answer the railway company admits the execution of the agreement of May 2, 1888, and denies that the lumber company has performed, in that it has not shipped East at least 60 per cent. of the lumber manufactured from logs cut on the lands agreed to be sold nor on adjacent lands to which the rate clause applies. Payment of the purchase price of the land about the year 1912 is admitted, but there is a denial of breach of the log rate term of the contract. The answer also sets up the Act of Congress of August 29, 1916 (39 Stat. 645 [Comp. St. § 1974a]), whereby the President of the United States in time of war was empowered to take possession of the transportation systems of the United States, and it is alleged that the Northern Pacific Railway Company's lines were taken possession of as of January 1, 1918, and remained under the entire control of the United States until March 1, 1920, and that under the Act of Congress of March 21, 1918 (40 Stat. 451 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p]), during the period of federal control, the President had the power to initiate rates, fares, and charges by filing the same with the Interstate Commerce Commission; that on May 25, 1918, the Director General of Railroads filed and made effective as of June 25, 1918, his general order No. 28, whereby all log rates in Washington were increased 25 per cent. and tariffs were published accordingly, and that the increased rate paid by the lumber company was paid to the United States Railroad Ad-

ministration for which the Northern Pacific Railway was in no way responsible. The railway company also pleads the Act of Congress of February 28, 1920, the Transportation Act (41 Stat. 456), and alleges that by section 15a of the Interstate Commerce Act, added by section 422 of that act (Comp. St. Ann. Supp. 1923, § 8583a), the Interstate Commerce Commission was authorized to initiate or adjust rates so that carriers would under efficient management earn an aggregate net railway operating income equal to a fair return on the aggregate value of the railroad property of such carriers and empowering the Interstate Commerce Commission to remove any unjust discrimination against interstate commerce by a schedule of state rates. It alleges that, after investigation, the Interstate Commerce Commission raised rates 25 per cent. over then existing rates, effective August 26, 1920, and that pursuant to that order the department of public works of the state of Washington made 25 per cent. advance applicable within the state of Washington, so that the rate of $1.25 per thousand feet was increased to $1.56½ per thousand feet, and tariffs were published and became effective August 26, 1920; that the department of public works of the state of Washington, after investigation, made an order February 1, 1922, prescribing a reasonable schedule of log rates and fixing $1.65 per thousand feet, and also providing that contract rates, including the contract sued on in this case, in conflict with the rates named should be canceled.

For a counterclaim the railway company set up that it has complied with its contract except as prohibited by law, but that the lumber company has not cut 75,000,000 feet of timber, and has not shipped East 60 per cent. of the lumber manufactured, as provided by the contract, to the damage of the railway company, and that the lumber company will continue to ship, unless restrained, an ever increasing quantity of lumber by means of conveyances other than over the lines of the railway company.

The lumber company answered, denying breach of contract, and alleging that during 1921 the interior and Mississippi Valley markets did not afford profit for lumber of 15 per cent., as stipulated in the contract, over the transportation cost and the cost of manufacturing and marketing; alleging that in 1922 the lumber company offered the railway company a greater amount of lumber shipments than 60 per cent. of 75,000,000 feet, which the railway company refused to accept because of car shortage; and alleging that the lumber company had shipped and will continue to ship the full quantity of lumber via the Northern Pacific Railway provided in the contract.

To this answer the railway company replied, denying that in 1921 the markets of the interior and Mississippi Valley did not afford a profit of 15 per cent. on lumber, and alleging that there was no competition at that time with lumber produced in Wisconsin, Minnesota, and other middle western states. It also alleged that in 1921 the Lumber company cut from the lands involved in this suit much more than 40,000,000 feet, and that the proviso of paragraph 6 of the contract does not apply to release the lumber company from the obligation to cut 75,000,000 feet of timber and to ship East 60 per cent. of the lumber product. It denied that in 1922 the lumber company offered for shipment a greater quantity than 60 per cent. of the lumber, and pleaded that it furnished all the cars for which demands were made in accordance with the car service rule in effect at that time. By way of supplemental counterclaim it alleges further breaches of the contract since the answer and original counterclaim were filed in the matter of cutting the quantity of timber and making shipments as provided in the contract. The prayer of the railroad company is that the complaint of the lumber company be dismissed; that the railroad company have an accounting for damages sustained by reason of the breach of the contract in regard to shipping the lumber; that further violation of the contract be restrained, and for general relief.

After trial the court decreed that the lumber company was not entitled to recover under that clause of the contract whereby the railroad company agreed to transport logs at the rate of $1 per thousand feet; that the lumber company is not required to cut 75,000,000 feet of timber per annum, and to ship over the lines of the Northern Pacific Railway Company; that the lumber company is not required to ship over the lines of the railroad company to points East, for the reason that the provisions of the contract relating to shipment of logs and lumber are in conflict with public policy and void. It was further adjudged that, as the lumber company had complied with the provisions of the the contract in so far as they were binding upon the parties, it could recover title to the lands free of all shipping provisions of the contract. The counterclaim of the railroad company was dismissed. Both parties appeal.

Geo. T. Reid, C. H. Winders, and L. B. Da Ponte, all of Seattle, Wash., for appellant and cross-appellee.

Herbert S. Griggs, of Tacoma, Wash., and Benjamin S. Grosscup, of Seattle, Wash., for appellee and cross-appellant.

Before GILBERT, HUNT, and RUD-KIN, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The railway company assigns error upon the ruling that the lumber company is not required to cut 75,000,-000 feet of timber and ship 60' per cent. of the lumber manufactured therefrom over the lines of the railway company; (2) that the lumber company is not required to ship 60 per cent. of the lumber manufactured from timber cut on the lands described in the contract to points East on the Northern Pacific Railway, and in adjudging that such provision of the contract is in conflict with public policy and void; (3) that the lumber company had complied with the lawful provisions of the contract, and is entitled to conveyances to the lands free from the shipping provision of the contract; (4) in denying injunction restraining the lumber company from breach of the contract with relation to routing 60 per cent. of the lumber manufactured from timber taken from the lands described in the contract and adjacent lands to points East on the Northern Pacific Railway and beyond.

The lumber company, on the other hand, assigns error, in that the decree denies to the lumber company an accounting and judgment for damages because the railway company has refused to carry and transport the logs from the lands at the rate of $1 per thousand feet; (2) denies to the lumber company an accounting and judgment for damages sustained because the railway company has refused, since March 1, 1920, to carry and transport the logs cut from the lands adjacent to the lands purchased over its lines at the rate of $1 per thousand feet; (3) denies to the lumber company equitable relief against the threatened refusal of the railway company to carry logs from the lands covered by the contract or from adjacent lands at the rate of $1 per thousand feet; and (4) that it adjudges the contract to carry the logs at the $1 rate not enforceable.

For about 30 years the parties, with practically no friction, recognized the agreement as a guide for their respective rights. Then, during the World War as of January 1, 1918, under Act of August 29, 1916 (39 Stat. 645 [Comp. St. § 1974a]), the President of the United States took possession of the Northern Pacific Railway and kept control thereof until March, 1920. During such control by order No. 28, freight rates were lawfully increased. Thereafter, under Act of Congress February 28, 1920 (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.), federal control was ended, and the railroad was delivered back to its owners. The Interstate Commerce Commission, after investigation, made its order 74 (58 Interst. Com. Com'n R. 220) effective August 26, 1920, increasing certain intrastate, as well as interstate, rates, and the local authority of the state of Washington by its order (cause 5092) applied the advance made by the national Commission to all intrastate rates. Questions of the proper construction of the contract between the parties to this suit then arose; the principal point being whether carriage at the rate of $1 per thousand feet can be enforced. Both parties treat the contract as subsisting at least in part, but each alleges one or more breaches by the other.

[1] We find ourselves unable to sustain the view that when the contract was made it was void under sections 2 and 3 of the Act of February 4, 1887 (24 Stat. 379 [Comp. St. §§ 8564, 8565]), then in force, in so far as it required the lumber company to ship 60 per cent. of the lumber from timber cut upon the lands, as such requirement was fraught with an implied obligation on the part of the railroad company to furnish cars to a specific number which would operate in favor of the lumber company to the prejudice of other shippers. The sections referred to of the Act of February 4, 1887, prohibit, by special rates, rebates, or charges, unjust discrimination and undue preference or advantage, but the Supreme Court has held that, subject to those two "leading prohibitions," common carriers could make special rates looking to the increase of their business, and could contract for transportation, subject, though the contract might be, to change of rates in manner provided by statute. Interstate Commerce Commission v. Chicago, Great Western R., 209 U. S. 108, 28 S. Ct. 493, 52 L. Ed. 705. Looking into the contract before us, there is no obligation whereby a preference was given to the lumber company or wherein there is an undue discrimination against other shippers. There was the possibility that the railway company might perform its agreement to furnish cars in an unlawful way, but we cannot think that of itself is sufficient to invalidate the agreement to furnish cars, or that such a possibility should overcome the implica-

tion that cars would be furnished only in accordance with the requirements of the law. American Express Co. v. Lindenburg, 260 U. S. 589, 43 S. Ct. 206, 67 L. Ed. 414; Louisville & Nashville v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; O-R & N Co. v. Dumas, 181 F. 781, 104 C. C. A. 641. Davis v. Cornwell, 264 U. S. 560, 44 S. Ct. 410, 68 L. Ed. 848, is to be distinguished. There the court, citing C. & A. R. R. Co. v. Kirby, 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501, held that a contract to supply cars for loading on a day named provides for a special advantage to the particular shipper as much as a contract to expedite the cars when loaded; but here there is no absolute obligation to supply cars in specific numbers at a specific time; and we cannot imply a promise to do an unlawful act. We therefore construe the contract as requiring that cars should be supplied on reasonable demand therefor. Hobbs v. McLean, 117 U. S. 567, 6 S. Ct. 870, 29 L. Ed. 940.

[2] In 1918, after the action of the rate-making bodies, it was impossible for the railway company lawfully to perform the log rate clause. But that did not invalidate the contract, for in the terms of the agreement it was necessarily implied that while the railway company would carry at the rate of $1 per thousand feet so long as it could lawfully make such rate yet, if by lawful authority the rate should be lawfully changed, the carriage at the $1 rate could not be performed. A lawful change of a rate fixed by a public service company under a contract for doing a service does not destroy the contract, but modifies its terms consistently with what presumably the parties to the contract incorporated in their agreement. Union Dry Goods Co. v. Georgia Public Service Commission, 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; Suburban Water Co. v. Oakmount, 268 Pa. 243, 110 A. 778. The language of paragraph 6 wherein the railway company shall, "so far as it lawfully may, fix such rates and charges as will enable the purchasers to compete in the interior and Mississippi Valley lumber markets with the lumber districts of Minnesota and Wisconsin," while dealing with the matter of competition, none the less indicates that the parties had in mind possible legal restrictions upon the power of the carrier to fix rates and charges. Pinney & Boyle v. Los Angeles Gas & Electric Co., 168 Cal. 12, 141 P. 620, L. R. A. 1915C, 282, Ann. Cas. 1915D, 471; New River Lumber Co. v. Tenn. Ry., 145 Tenn. 266, 238 S. W. 867.

The recent case of Hawkeye Portland Cement Co. v. C. R. & P. (Iowa) 201 N. W. 16, well illustrates the principle we apply. As a result of war conditions and after action through lawfully constituted agencies, rates were advanced by the federal Director of Railroads, and, simultaneously, intrastate rates in Iowa were raised. Then, after a return of the railroad to private operation under the terms of the Transportation Act of February, 1920, and after an increase in the rate territory of which the state of Iowa forms a part, the board of railroad commissioners of the state, in August, 1920, made an order advancing Iowa intrastate rates to conform to the advances theretofore made by the Interstate Commerce Commission. Upon a claim made by a shipper for a special rate privilege under a contract made in 1907 it was held that the rate, having been one collected by a common carrier charged pursuant to legislative authority, was made subject to the right of the state or of Congress to modify or annul it under the sovereign power to regulate rates. New York v. United States, 257 U. S. 591, 42 S. Ct. 239, 66 L. Ed. 385; Minn. R. Co. v. Menasha Woodenware Co., 159 Wis. 130, 150 N. W. 411. The decisions of the Supreme Court of Washington are also consistently firm in upholding the principle that the contract was subject to be impaired by the exercise of the police power of the state. Cowley v. Northern Pacific R. Co., 68 Wash. 558, 123 P. 998, 41 L. R. A. (N. S.) 559; Raymond Lumber Co. v. Raymond Light & Water Co., 92 Wash. 330, 159 P. 133, L. R. A. 1917C, 574; N. C. Power Co. v. Public Service Commission, 114 Wash. 102, 194 P. 587; Monroe Water Co. v. Monroe, 130 Wash. 351, 227 P. 516. If the cases cited are in conflict with R. & T. Co. v. Great Northern Railway, 58 Wash. 604, 109 P. 320, 1020, the later decisions must govern.

[3] The argument that regulatory power does not extend to cases where property is owned by the carrier does not meet the question presented. It is true the railway company was in part moved to enter into the contract for profit in moving logs as well as for sale of its lands, with a view of stimulating the production of lumber, and thereby increasing carriage of lumber products, but it had no interest as an owner in the products of the land, nor was the lumber hauled for the use of the railroad. Cases like Haddock v. Delaware, L. & W, R., 4 Interst. Com. Com'n R. 296, and Coxe v. Lehigh Valley R., 4 Interst. Com. Com'n R. 535, do not control, for, as pointed out by the Su-

preme Court in New York, New Haven R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 S. Ct. 272, 50 L. Ed. 515, those cases involved the consideration of obligations where the function of producing and transporting were so interblended that it was impossible to separate one from the other. We think they can be separated in the instant contract. So, too, is Santa Fé Ry. v. Grant Brothers, 228 U. S. 177,'33 S. Ct. 474, 57 L. Ed. 787, distinguishable. The contract there considered was for grading a roadbed belonging to the Santa Fé Railroad, and under the particular facts the court held that in transportation of the character described over its own road in connection with construction of improvement of its own road the company was not acting in the performance of its duty as a common carrier, and that therefore the agreement with the contractor was outside of the policy of the provisions of the Interstate Commerce Act.

[4] Counsel for the lumber company say that sections 13 and 15 of the Interstate Commerce Act, as amended by the Transportation Act of 1920 (41 Stat. 474 [Comp. St. Ann. Supp. 1923, §§ 8581, 8583]), do not authorize the Interstate Commerce Commission to exercise the power granted to it by affecting particular instances by a general order, and that no general order of the Interstate Commerce Commission could affect a special rate valid under the laws of the state. But in the Wisconsin Rate Case (Railroad Commission of Wis. v. Chicago B. & Q. R. Co.) 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086, and in New York v. United States, supra, the court, in considering order 74, I. C. C., upheld the authority of the Commission to remove by order undue, unreasonable, or unjust discrimination against interstate commerce by fixing intrastate rates for the purpose. The order applied to all intrastate rates; tariffs were duly published; on the face of the findings the order was valid; and comprehended log rates made by private persons with carriers. Louisville & Nashville R. R. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671. '

[5] Having shown that the railway company could not continue to haul at the $1 rate after the orders of the legislative authorities went into effect, we inquire, What obligations remained? We cannot see how there can be a refund by the railroad company of money paid by the lumber company on account of the lawfully established higher rate. The prohibitions against remitting and refunding of any portion of lawfully established rates or charges are perfectly clear in the statutes of the United States and in those of the state of Washington; and the decisions are practically uniform in condemning arrangements which are but devices by which rebates are given to shippers. United States v. Union Stockyard, 226 U. S. 286, 33 S. Ct. 83, 57 L. Ed. 226; Central of Georgia v. Blount, 238 F. 292, 151 C. C. A. 308, and the Washington cases, supra; Acts 1905, p. 145 et seq., Laws of Washington; Acts 1911, p. 551, Laws of Washington. The railway company, having received nothing from the lumber company except the lawfully published tariff rates, cannot be held in specific performance or for damages under the $1 rate clause. Northern Pacific R. Co. v. North Dakota, 250 U. S. 135, 39 S. Ct. 502, 63 L. Ed. 897; Wisconsin Rate Case (Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co.) 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086.

[6] It is in evidence that the total cruise of timber sold was 767,000,000 feet. Thus it is plain that, if the lumber company had cut each year 75,000,000 feet of the particular varieties of lumber specified in the contract, and had shipped 60 per cent. thereof, the cutting and shipping clause would have been fulfilled before 1918 when the rates were raised. But, except during 1922, the lumber company was in default each year. Some years the default was unsubstantial, but in other years the cut was way short, and in 34 years has been little over 50 per cent. of that contracted for. There is therefore now remaining a very large and valuable lot of uncut timber. The significance of this is that, while the railway company could not after 1918 carry at the $1 rate, inability in that respect ought not to affect the contract in other respects, provided, always, there was no waiver of the shipping and cutting clauses to which we now turn attention, or no default in performance.

[7] The view that the acceptance in 1912 by the railway company of the purchase price of the lands was a waiver does not seem well grounded, for the lumber company in paying for the lands was fulfilling one of the provisions of the contract, and the company in receiving such payments only accepted what it was entitled to under the contract. Be that as it may, as no claims for damages are made for defaults of the lumber company prior to 1920, the railroad company is to be regarded as having waived strict compliance with the cutting and shipping clause prior to that date. But, now that it has been sued by the lumber compa-

ny to compel compliance with the $1 rate clause, having performed by giving title to the lands, it has the right to defend and to insist upon performance by the lumber company, and to claim damages for defaults since 1920. Or, putting it in this way: If it be equitable that the lumber company, because of the increase in freight rates, although it was in default, should now be relieved of its agreement to cut and ship as agreed upon, it is equally equitable that the railroad company should be relieved of its agreement to transfer lands not yet conveyed and to pass title to timber still standing. This seems to be especially just, considering that the cause of the failure of the lumber company to live up to the shipping requirements since 1920 has been, not by reason of difficulties over which it had no control, but because it preferred to make shipments over other rail routes or by steamer through the Panama Canal, by which route the rates have been less. It is argued that the lumber company was at times hampered by an inadequate supply of cars agreed to be furnished by the railroad company, and that therefore the railroad company was in default. Undoubtedly, between August and December, 1922, there was a shortage of cars which prompted the lumber company to complain to the railroad authorities. Upon this point the substance of the allegation of the lumber company in answer to the cross-complaint of the railroad company is that in 1922 the lumber company offered for shipment to the railroad company lumber manufactured at its mill in quantity and amount greatly in excess of 60 per cent. of the amount cut from the lands, and greatly in excess of 60 per cent. of the 75,000,000 feet, but that the railroad company refused to accept the lumber for shipment and to transport by reason of car shortage. The averment lacks definiteness. There is nothing in the contract which imposes an obligation upon the railroad company to furnish cars to transport generally a quantity of lumber greatly in excess of 60 per cent. of the amount cut, but only to transport 60 per cent. of the lumber manufactured from fir, cedar, and spruce cut on the contract lands. Where a railroad company is obligated to furnish cars sufficient to move an agreed quantity of freight, but is unable to furnish the cars on demand to comply with such an agreement, unless it discriminates against other shippers, then the duty of the railroad company is to furnish the pro rata of cars supplied and to fulfill to the best of its ability. The obligation is always subject to the

requirement that in times of car shortage there shall be no discrimination or preference by the carrier against other shippers in favor of the shipper who has made the contract.

Looking to the testimony, it discloses that, according to a written statement prepared by the lumber company showing cars ordered and received from August 1 to December 31, 1922, of 1,780 cars ordered only 680 were furnished; but by the table prepared by the railroad company only 561 cars were ordered during the period named, all of which were furnished. This wide variance between the tables was explained by the chief clerk in the freight office of the railroad company at Tacoma, who testified that in making up the record of cars ordered he used the car register books, which were posted daily, and did not include requests for cars, for the practice of the railroad company was to await confirmation in writing of telephone orders for cars; that occasionally the railroad company furnished cars upon the assurance of the shipper that written confirmation would follow, but that all confirmed orders were filled so far as his office was concerned. The car service agent of the defendant testified that between the dates mentioned there was a car shortage on the Northern Pacific Railway and on other roads, and that at such times the number of cars a shipper would receive would be its proportion and not the number of cars requested; that there was a general plan of car distribution in time of shortage, intended to secure equal distribution in proportion to ratings which were based upon capacity for production of lumber; that a shipper was required by rule of the railroad company to place a written order for cars. These explanations were not refuted, and, as there is nothing in the rule of the company requiring confirmation of orders that conflicts with the contract or general rules governing furnishing of cars, it would follow that there was no breach of the obligation to furnish cars on the part of the railroad company.

Paragraph 5 of the contract obligates the lumber company to erect mills to cut 90,000,000 feet per annum, and to cut "on said lands at least 75,000,000 feet of timber of the description and character aforesaid and ship the lumber manufactured therefrom over the Northern Pacific Railroad, as hereinafter provided." By paragraph 6 the railroad company is to transport the logs "cut on said lands or upon adjacent lands of the purchasers * * * to Tacoma at the rate of $1 per thousand feet," etc., and the lum-

ber company agrees that it will ship "at least 60 per cent. of the lumber manufactured from the timber cut on the lands aforesaid to points east on the Northern Pacific and beyond." In consideration of antecedent covenants the railway company by covenant, sells the timber upon the lands "next hereinafter described," etc. We are of opinion that the $1 rate applies to all logs transported, and that the words relating to the lands from which the product of logs was to be shipped apply only to the railroad lands described in section 2, lands acquired by the railroad company from the United States by Act of Congress.

There is no substantial ground for the contention of the railway company that it can recover damages from the lumber company for the value of quantities of hemlock and other varieties of timber, as well as smaller fir, cedar, and spruce that have been cut upon the contract railroad lands. It is not going outside of common knowledge to observe that years back in the Northwest timber sections hemlock was of little commercial value, and our construction of the agreement is that enumeration of certain varieties of timber was because only the varieties named then had commercial value, and that omission to name other varieties was not by way of reservation of title to timber not specified. We agree with the District Court that the timber belongs to the lumber company. In more recent years conditions have changed and shipments of hemlock have been made. The practice has been for the railway company to give credit to the lumber company for such shipments, and it is our view that it is equitable that the practice should be continued.

There is a suggestion that the railroad company entered into the contract in its private capacity and that a logging railroad is a private one not subject to legislative control. We are of opinion that the District Court was correct in holding that the $1 rate provided was to apply, not only to the seven-mile extension known as the Orting & Southeastern Railroad, but also to the common carrier lines owned and operated by the Northern Pacific Railroad, extending from a junction with the log road at Orting to Tacoma.

The lumber company introduced evidence tending to show that in 1921 a 15 per cent. profit could not be made upon shipments to certain eastern markets referred to in paragraph 6 of the agreement, and that, as a consequence, 40,000,000 feet should be deducted from the total cut of that year. On the other

hand the railroad company argues that, there being evidence that in 1921 the lumber manufactured from logs cut on the contract lands was over 80,000,000 feet, of which but 37 per cent. approximately was shipped via the Northern Pacific to points East, though many hundred car loads were shipped East to competitive points, and also that, as in 1921 there was no competition with the lumber districts of Minnesota and Wisconsin (the supply of lumber from those districts having been exhausted), reasons for applying the special competition clause did not exist; hence the more general provisions obtained and required the shipment of 60 per cent. of the 75,000,000 feet over the lines of the Northern Pacific to points East.

Our opinion is that under the second clause of paragraph 6 the lumber company was authorized to cut 40,000,000 feet, free from the obligations of the 60 per cent. clause of the contract during the time that the market conditions in the interior and Mississippi Valley were so depressed that the lumber company could not manufacture and transport the lumber to the Mississippi Valley markets at a profit of 15 per cent. on actual cost on cars at the mill. The lumber company could cut or not, as it pleased, while the 15 per cent. profit was not to be had. If, however, it chose to cut and to ship at a profit of less than 15 per cent., it could not cut more than 40,000,000 feet on the contract lands. However, as it did cut in excess of the 40,000,000 limit in 1921, and did ship lumber manufactured from timber cut in excess of that limit, 60 per cent. of the lumber made from timber cut in excess of the 40,000,000 limit that was shipped to eastern Mississippi Valley points ought to have gone over the Northern Pacific lines, and for freight money for shipments of such excess made over competitive routes the lumber company is liable in damages to the railway company.

The accounting shall be with relation to the views just expressed.

The lumber company was and should be relieved from cutting any specific quantity of timber in any one year upon the lands described in the contract, but that of whatever quantity of lumber has been or may be manufactured from the timber of the kinds named in the contract or of other kinds, since March 1, 1920, upon the railroad lands described in the contract, 60 per cent. thereof should have been and must be shipped via the Northern Pacific Railway to points East and beyond.

The lumber company shall account to the

railway company for all timber that has been actually cut from the railroad lands specified in the contract since March 1, 1920, and shall account for all lumber manufactured from such timber, and for all shipments of lumber manufactured from such timber, and shall be liable for freight rates upon 60 per cent. of all such shipments to the East, payments to be reckoned upon the basis of the freight rates which have been lawfully effective since March 1, 1920.

For any and all shipments of lumber manufactured from timber actually cut upon the lands described in the contract that have been sent over the Northern Pacific lines to points East since March 1, 1920, credit shall be given to the lumber company for any sums which it may have paid to the Northern Pacific Railway Company for transportation of such lumber, so that the lumber company shall be liable for damages only in such sums as it would have been liable for to the railroad company had it shipped the 60 per cent. of such lumber over the lines of the Northern Pacific Railway East.

In the accounting no interest should be allowed prior to the date of the decree to be entered. Thereafter interest shall run at the legal rate as fixed by the statutes of the state of Washington.

The costs of this appeal shall be equally divided between the railway company and the lumber company.

The decree of the District Court is reversed, and the cause is remanded, with directions to set aside the decree heretofore made, and to proceed to any necessary accounting, taking such additional testimony as may be requisite, and thereafter to enter a decree in accordance with the views we have expressed.

Reversed and remanded.

### Addenda to Opinion.

As we did not intend to foreclose all inquiry into the matter of accounting or car shortage, the following will be added to the opinion on file:

In the matter of the car shortage and the accounting with respect thereto between August 1, and about December, 1922, to the end that the lumber company shall not be held liable for failure to make shipments in cars which the railway company could not furnish during such period, neither party is precluded from offering further competent evidence tending to show what quantity of lumber, if any, manufactured from the lumber cut on the railway lands, was tendered by the lumber company to the railway company during the aforesaid period, between August 1 and December, 1922, what quantity was accepted, and what quantity, if any, was declined, to what points shipments were offered and received or refused, if any there were, and any further competent evidence that may be relevant to the issues of the alleged car shortage between the above-mentioned dates.