## CONSOLIDATION COAL CO. v. WESTERN MARYLAND RY. CO.

### No. 1573.

District Court, D. Maryland.

Oct. 10, 1930.

Brune, Parker, Carey & Gans, and W. Ainsworth Parker, all of Baltimore, Md., and Samuel Seabury, William Dean Embree, and Harrison Tweed, all of New York City, for plaintiff.

Joseph C. France and George P. Bagby, both of Baltimore, Md., and Robert T. McCracken, of Philadelphia, Pa., for defendant.

WILLIAM C. COLEMAN, District Judge.

The question presented for decision is whether this court should grant or should

overrule the motion of the defendant, the Western Maryland Railway Company, to dismiss, for want of jurisdiction, the bill of complaint filed by the plaintiff, the Consolidation Coal Company, in which the plaintiff asks that a certain written agreement between it and the defendant be declared null and void; that the defendant be required to surrender the agreement for cancellation and be restrained from hereafter asserting that it is valid or enforceable, and, therefore, from ever attempting to bring any proceedings of any kind against the plaintiff, based upon any alleged breach by the plaintiff of any obligation under the agreement.

In support of its motion, defendant assigns the following reasons: (1) Absence of diversity of citizenship between the parties; (2) that the bill of complaint does not raise an issue either as to the validity or the construction of the Constitution or any law of the United States; and (3) that the bill of complaint does not state a cause of action cognizable by a federal court sitting in equity.

The following principles are beyond controversy: (1) The motion must be decided upon the face of the bill, and all facts which it alleges must be assumed to be true. Kansas v. Colorado, 185 U. S. 125, 22 S. Ct. 552, 46 L. Ed. 838; Conway v. White (C. C. A.) 292 F. 837. (2) The question of whether or not this court has jurisdiction must be determined by the situation as it existed at the time the bill was filed, and, if there was jurisdiction then, it is not lost by the subsequent filing of a suit at law by the defendant in another jurisdiction—as has occurred—whereby an adequate legal remedy may have become available. Dawson v. Kentucky Distilleries & Warehouse Co., 255 U. S. 288, 41 S. Ct. 272, 65 L. Ed. 638; Minneapolis R. R. v. Peoria R. R., 270 U. S. 580, 46 S. Ct. 402, 70 L. Ed. 743; Jefferson Standard Life Insurance Co. v. Keeton (C. C. A.) 292 F. 53. It is admitted that, shortly after the filing of the present suit, the railroad company instituted an action at law against the coal company in the court of common pleas of Philadelphia county, Pa., for damages under the contract, and that the coal company has removed the action to the United States District Court for the Eastern District of Pennsylvania.

The following material allegations of the bill of complaint are thus admitted to be true: The plaintiff is a Maryland corporation, carrying on the business of mining, selling, and shipping coal in interstate commerce. The defendant is a consolidated corporation organized under the laws of both Maryland and Pennsylvania. Under date of September 25, 1915, the parties entered into a written contract, made a part of the bill of complaint, which was signed by the then presidents of the respective companies. This contract recites that the coal company was engaged in the establishment of certain coal mines in Somerset county, Pennsylvania, and in the Fairmont district of West Virginia; that in order to effect the completion and operation of such mines, and to afford means of transportation of the coal taken therefrom, the coal company desired to arrange transportation facilities; that the railroad company was willing to construct lines of railroad and to acquire facilities to serve these prospective mines provided it might be assured of the transportation over such lines of certain amounts of coal. In consideration of these premises, the contract then recites the terms of the agreement which, summarized, are as follows. The coal company shall proceed with the establishment of the mines and shall complete and equip them as soon as practicable, so that the coal therefrom will be available for transportation over the lines to be constructed by the railroad company. Upon completion by the railroad company of its lines to the mines, and upon furnishing sufficient transportation facilities, the coal company shall, as soon as its mines are equipped and developed, ship three and a quarter million tons of coal annually over such lines, provided that the rates for transportation of the coal are the same as those charged by other railroad companies for similar service, and, further, pending the final completion, equipment, and development of these mines, the coal company shall ship over the lines so to be constructed all coal which it might produce from these mines in the ordinary working thereof. On its part, the railroad company shall construct the proposed lines from points of connection with the Baltimore & Ohio Railroad to the coal company's mines, then established, or in process of establishment in the district referred to, and shall maintain and operate such lines and shall establish and maintain such connection and facilities, and furnish equipment in such amount, as shall enable the shipment over its lines of the coal which the coal company agrees to deliver for transportation. The agreement recites that it shall continue in full force and effect for the term of fifty years from its date, subject to a proviso, not material to the present controversy, in the event the mines shall become exhausted or the

coal unminable. Lastly, it provides that the mutual obligations are subject to "strike, war, accidents, acts of God or public enemies."

Summarized, the substance of the contract is this, that the coal company, owning certain coal land, without transportation facilities, agreed with the railroad company that, if the latter would serve the mines, the coal company would develop them, and ship over the rails of the railroad company a specified number of tons of coal each year for a period of fifty years.

After a lengthy allegation as to both the common-law and statutory duties of the railroad company with respect to the carriage of the coal, as provided for in the contract, the bill recites that prior to the completion, equipment, and development of the mines, and prior to the construction of the lines of railroad, as provided for in the contract, the United States entered the World War, and the bill then contains reference to the Fuel Control Act of August 10, 1917 (40 Stat. 276), and to the Railroad Control Act of December 28, 1917 [See Act Aug. 29, 1916, 39 Stat. 645, 10 USCA § 1361, and proclamation thereunder Dec. 26, 1917, 10 USCA § 1361 note], enacted as a result of the war. The bill alleges that, under the first of these acts, the President, having extensive powers, fixed the prices of coal and appointed a Fuel Administrator, who issued rules and regulations binding upon the plaintiff, limiting and otherwise interfering with its right and ability to mine, sell, and ship coal, thereby making it impossible for the plaintiff to perform under the contract; that under the Railroad Control Act, the President took over the operation of all lines of railroad, including those of the defendant, and thus the contract became impossible of further performance, the Federal Director General of Railroads refusing to recognize or carry out any contracts between coal mining companies and railroads. While plaintiff has argued that defendant, as well as itself, has never performed under the contract, that is, that the contract remains entirely executory, the plain and inescapable inference from the language of the agreement itself, both in the preamble and in the contractual clause, is that the mines in question, being at the time in process of establishment, were not then served—at least not adequately—by any railroad, and that the purpose and result of the agreement was to have defendant serve them. Therefore, when, in paragraph 26 of the bill, plaintiff asserts that during the World War, and thereafter, when the carriers were returned to private ownership, "the plaintiff continued to operate its said mines and to ship coal therefrom in interstate and foreign commerce over the lines of the defendant, the said shipments being made in cars furnished by the defendant for that purpose," this must be taken as an admission that the defendant had in fact constructed the proposed lines and had been affording transportation facilities to these particular mines pursuant to the contract, and not otherwise.

The bill then alleges that, due to the war, and substantial changes in the conditions affecting all kinds of industries, the plaintiff and defendant understood and recognized that the means affecting the production of coal had, since the agreement was made, so substantially altered, to the prejudice of the plaintiff, and would for an indefinite, but in any event long, period of time, continue so to be altered, to its prejudice; that, if the contract had imposed any liability on the plaintiff or defendant, it was thereby abrogated; that such coal as was shipped by plaintiff over defendant's lines following the return of the carriers to the railroad companies by virtue of the Transportation Act of 1920 (41 Stat. 456), was independent of the provisions of the contract, and that both parties had, throughout said period, treated the contract as invalid and unenforceable, and neither had purported to be bound thereby; but that nevertheless, in the month of May, 1928, the defendant, for the first time since the declaration of the war, had asserted the validity of the contract and a claim thereunder in excess of $5,000,000 against plaintiff; that when such claim was called to the attention of the then president and chairman of the board of directors of the coal company, they made inquiry, and, while discovering the existence of the written agreement, found no resolution of the board of directors and stockholders authorizing its execution and delivery. The bill then, independently of the foregoing reasons, alleges that the agreement is invalid and unenforceable because it discriminates in favor of the plaintiff against other shippers, in the matter of transportation facilities, in violation of the Interstate Commerce Act (49 USCA § 1 et seq.).

Continuing, the bill alleges that plaintiff is seriously prejudiced in its relations with its creditors, and others from whom it will be obliged to seek credit, by the assertion by the defendant of its claim as aforesaid, and that plaintiff will continue to be so prejudiced unless and until such claim is adjudicated to be

invalid and defendant enjoined from asserting it; that plaintiff has outstanding mortgage bonds in the hands of the public amounting to upwards of $7,000,000, nearly half of which are maturing within approximately a year, and the rest within four years; that it has already attempted to negotiate the refinancing thereof, but has thus far been unable to do so; that such inability will continue unless and until defendant is enjoined from asserting the validity of its claim, and that, in general, plaintiff will be hindered and embarrassed in the conduct of its business, and in the financing and refinancing of its corporate obligations. Lastly, the bill alleges that the defendant, in spite of its recent assertion, as aforesaid, of its large claim against the plaintiff for breach of the contract, has taken no steps to establish this claim, and that the plaintiff is powerless to require defendant to do so; that meanwhile persons who would be important and material witnesses for the plaintiff in defeating such claim, if sued upon, have died, and others may die or leave the jurisdiction, and that plaintiff thereby will be deprived of their testimony, to plaintiff's irreparable injury. Then follow the prayers of the bill which have heretofore been summarized.

From the foregoing analysis, it will be seen that the grounds set up in the bill of complaint, upon which this court is asked to decree a cancellation of the agreement, are: (1) That it is invalid because it violates the Interstate Commerce Act; (2) that it was rendered void by the Fuel Administration and the Director General of Railroads; (3) that as a result of the war and ensuing conditions, it was generally understood between the parties to have been thereby abrogated and to have no further force or effect; and (4) that it was never authorized by the board of directors of the coal company, and therefore was invalid from its inception.

■■ The requisite jurisdictional amount in controversy is both alleged and obviously involved by the very nature of the suit. Lack of diversity of citizenship of the parties is admitted, the plaintiff being a Maryland corporation, and the defendant, being incorporated in Maryland as well as Pennsylvania, must, for the purpose of this suit, be treated as a Maryland corporation. Memphis, etc., R. R. Co. v. Alabama, 107 U. S. 581, 2 S. Ct. 432, 27 L. Ed. 518; Patch v. Wabash R. R. Co., 207 U. S. 277, 28 S. Ct. 80, 52 L. Ed. 204, 12 Ann. Cas. 518. However, the bill also alleges that the matter in controversy arises under the laws of the United States.

In order to give this court jurisdiction, the bill must not only present a cause of action arising under the Constitution or laws of the United States (Constitution, article 3, § 2), but must also involve a dispute or controversy which is both (1) properly within the equity jurisdiction of this court, and (2) real and substantial. 28 USCA § 80; Shulthis v. McDougal, 225 U. S. 561, 32 S. Ct. 704, 56 L. Ed. 1205; Carolina, etc., Ry. v. Lincolnton (C. C. A.) 33 F.(2d) 719. That is to say, this substantive requirement is twofold: First, the alleged federal question must exist not merely in form, but in substance; and second, even if it does, this court cannot entertain jurisdiction unless such controversy is one in which this court, according to established principles, should exercise equitable jurisdiction, which is merely another way of saying that the suit cannot be entertained if there is an adequate remedy available to the plaintiff at law. Such prohibition is expressly contained in the Judicial Code, 28 USCA § 384. Of course, before the test of inadequacy of remedy at law becomes applicable, some wrong must appear for which the plaintiff is entitled to redress. Therefore, unless and until it shall be determined that the case is in fact one cognizable in equity, it is immaterial to consider whether the merits of the controversy involve the validity, construction, or effect of a federal law.

The court concludes that it is without equitable jurisdiction to maintain this suit, because, in the words of the statute, "a plain, adequate and complete remedy may be had at law"; that is to say, it concludes that the motion to dismiss the bill must be sustained on the third ground asserted in the motion, for the following reasons:

■ The present suit is not for relief against either fraud, mutual mistake, multiplicity of suits, or abuse of legal process, for the last named of which, bills of peace and bills quia timet (to remove cloud on title) are available. The aforementioned types of cases represent those in which equitable jurisdiction is customarily invoked. It is true that, in order for this court to assume jurisdiction of a bill, it is not essential that the bill shall bear "a label already in stock." It is also true that equity is not prevented from assuming jurisdiction merely because a suit may involve features which, when isolated, may be insufficient in and of themselves to warrant the exercise of jurisdiction. The remedies afforded in the federal courts sitting as courts of equity are determined by those general principles of equitable juris-

diction exercised by the High Court of Chancery in England, at the time of the adoption of the Constitution and the passage of the original Judiciary Act (1 Stat. 73), unless subsequently changed by an act of Congress. Guffey v. Smith, 237 U. S. 101, 35 S. Ct. 526, 59 L. Ed. 856; Henrietta Mills v. Rutherford County, 281 U. S. 121, 50 S. Ct. 270, 74 L. Ed. 737. "It is true that the absence of precedents or novelty in incident presents no obstacle to the exercise of the jurisdiction of a court of equity.· It is the distinguishing feature of equity jurisdiction that it will apply settled rules to unusual conditions, and mould its decrees so as to do equity between the parties. But, while this is true, yet the facts of the case must come within some head of equity jurisprudence. When a person brings an equitable action, he must maintain it upon some equitable ground. The great advantage possessed by a court of equity is not so much in its enlarged jurisdiction as in the extent and adaptability of its remedial powers. Before the rule as to inadequacy of remedy at law is applied, some wrong must be shown for which the plaintiff is entitled to redress. In other words, there must be a cause of action, whether resort is had to one forum or the other. A court of equity, by avowing that there is a right, but no remedy known to the law, cannot create a right, in violation of the principles of both law and equity. Before there is a remedy, either at law or in equity, there must be a wrong cognizable in courts of justice under the established principles of law or equity; and what wrong have defendants done by merely asserting that they place upon the contracts in question a construction different from that for which plaintiff contends?" Chicago Auditorium Association v. Cramer (D. C.) 8 F. (2d) 998, 1009; Chicago Auditorium Ass'n v. Willing (C. C. A.) 20 F.(2d) 837; Id., 275 U. S. 519, 48 S. Ct. 122, 72 L. Ed. 404; Id., 277 U. S. 274, 48 S. Ct. 507, 72 L. Ed. 880.

Taking up, first, plaintiff's primary claim for relief in equity, which is that the contract was illegal from its inception because in violation of the Interstate Commerce Act, this being a conclusion of law and therefore not admitted by the motion, the real question is not the same as that which would arise were a plaintiff seeking redress on a contract which, on its face, showed that the parties were in pari delicto, but is rather a question of whether the defense of illegality is one which equity, under the existing circumstances, should entertain. If in fact "a plain, adequate and complete remedy may be

had at law," this court, as we have seen, is prohibited from assuming jurisdiction.

There is no question but that in an action at law the question of the validity or invalidity of a contract of this kind, under the Interstate Commerce Act, may be adjudicated. See Davis v. Cornwell, 264 U. S. 560, 44 S. Ct. 410, 68 L. Ed. 848; Chicago & Alton R. R. Co. v. Kirby, 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501. It is equally well settled that equity will never grant relief in cases of this kind unless the result of a failure to do so would be to effectuate an unlawful object, to defeat a legal prohibition, or to protect a fraud, namely, would be against public policy. For example, in Cleveland, etc., Rwy. Co. v. Hirsch (C. C. A.) 204 F. 849, equity assumed jurisdiction in order to prevent the continuation of rebating in violation of the Interstate Commerce Act. Similarly, in Chalmers Chemical Co. v. Chadeloid (C. C.) 175 F. 995, relief was granted against a violation of the Sherman Anti-Trust Act (15 USCA § 1 et seq.). Such cases as Northern Pacific Ry. Co. v. St. Paul & Tacoma Lumber Co. (C. C. A.) 4 F.(2d) 359; Id. (D. C.) 296 F. 749, are obviously not in point. There the prayer of the bill was for specific performance, a subject peculiarly within the jurisdiction of equity. In the present case there is no showing of law violation, failure to prevent which by prompt action would be against public policy. Quite the contrary, the bill asserts that no shipments have ever been made by plaintiff under the contract, and, if this be true, the contract has never resulted in violation of the Interstate Commerce Act, and cannot so result, because everything the defendant has done, namely, constructed its lines, and afforded transportation facilities over them, is entirely legal, unless and until performance under the contract, by the plaintiff, is begun, which, by the express allegations of the bill, plaintiff refuses to do, by reason of which refusal defendant has brought the action at law in another jurisdiction.

But even if we assume that the contract was on its face invalid from its inception because in violation of the Interstate Commerce Act, there still appears to be no warrant for the assumption of jurisdiction by this court, on the theory that the parties are in pari delicto. The rule as to equal guilt is thus stated in St. Louis Railroad v. Terre Haute Railroad, 145 U. S. 393, at page 407, 12 S. Ct. 953, 957, 36 L. Ed. 748: "The general rule, in equity, as at law, is in pari delicto

potior est conditio defendentis; and, therefore, neither party to an illegal contract will be aided by the court, whether to enforce it, or to set it aside. If the contract is illegal, affirmative relief against it will not be granted, at law or in equity, unless the contract remains executory, or unless the parties are considered not in equal fault, as where the law violated is intended for the coercion of the one party and the protection of the other, or where there has been fraud or oppression on the part of the defendant. Thomas v. Richmond, 12 Wall. 349, 355 [20 L. Ed. 453]; Spring Co. v. Knowlton, 103 U. S. 49 [26 L. Ed. 347]; Story, Eq. Jur. § 298."

As we have seen, the present bill must be taken as admitting that the defendant has performed, at least to the extent that it has built some lines to the coal company's mines, and has afforded transportation facilities therefrom, and we have further seen that there is nothing illegal in so doing. Thus the case is not one in which relief in equity should be granted under the rule above laid down by the Supreme Court, even though the contract be considered as still entirely executory on both sides with respect to any illegal performance. See, also, McCutcheon v. Merz Capsule Co. (C. C. A.) 71 F. 787, 31 L. R. A. 415.

Turning to the next ground for relief set up by plaintiff in its bill, namely, frustration by reason of war legislation, again there can be no question that this is a defense which may be asserted in an action at law. See Corona Coal Co. v. Davis (C. C. A.) 20 F.(2d) 738; Atlantic Steel Co. v. R. O. Campbell Coal Co. (D. C.) 262 F. 555.

The remaining arguments on which relief is sought, namely, that the contract never in fact came into existence because lacking the requisite authority of the board of directors of the coal company, and that the parties had tacitly agreed between themselves, by reason of the war and ensuing conditions, that the contract was abrogated, both obviously present questions of fact which are clearly matters subject to be proved and to have their legal effect established in an action at law.

It will be admitted that some of the analogies cited by defendant as a reason for denying relief to the plaintiff in the present case are not controlling. For example, a federal court will not, unless there is present some extraordinary condition, enjoin the collection of a state, county, or municipal tax. Boise Water Co. v. Boise City, 213 U. S. 276, 29 S. Ct. 426, 53 L. Ed. 796; Henrietta Mills

v. Rutherford County, supra. In all such cases where a contrary result was reached, such as Bank of Kentucky v. Stone (C. C.) 88 F. 383, upon which plaintiff relies, the facts are clearly distinguishable by reason of the peculiarly drastic nature of the particular law involved. This entire class of cases is also distinguishable from the present suit by reason of the fact that, under our scheme of government, federal courts sitting in equity are reluctant to interfere with the fiscal operations of state or local governments, unless such interference is clearly required in order to avoid confiscatory consequences to the litigant.

One of the principal contentions of the plaintiff is that it should not be required to wait for relief until defendant sees fit to sue on the contract; that is to say, that a remedy at law cannot be adequate if its adequacy depends upon the will of the opposite party. In support of this proposition plaintiff cites numerous cases in which the principle is applied, and we admit properly. But again, these cases present facts entirely distinguishable from those in the present case. That is to say, in all of the cases relied upon, there is either fraud or the interposition of some condition not voluntarily imposed by the parties themselves. For example, in Chicago Ry. v. Commission (D. C.) 280 F. 387, and Fredenberg v. Whitney (D. C.) 240 F. 819, the equitable remedy was granted to relieve against orders of administrative or quasi judicial bodies to which the plaintiff was subjected, not by reason of its own voluntary act, but quite the contrary, and which carried with them very heavy penalties. Similarly, in Reid v. Shaffer (C. C. A.) 249 F. 553; Mutual Life Insurance Co. v. Pearson (C. C.) 114 F. 395; Lincoln National Life Insurance Co. v. Peake (C. C. A.) 15 F.(2d) 303, fraud was the basis for the equity jurisdiction; and in other cases upon which plaintiff relies, such as Schmidt v. West (C. C.) 104 F. 272, 273, the intervention of wrongdoing of a third party, as through forgery of a note, gave obviously to the plaintiff an entirely different standing in equity from that of the present plaintiff, who seeks relief merely against the results of its own voluntary act.

An additional independent justification alleged by plaintiff for being permitted to resort to equity at once, without waiting until defendant may see fit to sue upon the contract, is the alleged necessity for the introduction of oral evidence to establish the invalidity and abrogation of the contract and

the possibility that, through delay, the necessary witnesses may die or their testimony be otherwise rendered unavailble. But here again, equity is not accustomed to grant relief merely because delay may endanger plaintiff's ability to produce evidence. The Judicial Code (28 USCA § 644) expressly provides for such a contingency by permitting the taking of depositions for the perpetuation of testimony. Whatever language may appear to be to the contrary in such cases as Schmidt v. West, supra, enough has already been said to indicate that the facts in those cases are clearly distinguishable.

In Sunset Tel. & Tel. Co. v. Williams, 162 F. 301, 22 L. R. A. (N. S.) 374, the Circuit Court of Appeals for the Ninth Circuit had presented to it a situation similar to the present one. There, a public service company attempted to require one of its employees, who had been injured in the course of his employment, to surrender for cancellation a pretended agreement with this employee for the release of all claims for damages on account of the injury; and to have the company's true agreement expressed and restored. The bill alleged that the company's copy of the true instrument had been accidentally destroyed, with the result that the company was deprived of any written evidence to establish the terms of that agreement; that the employee was making false assertions with respect to compensation provided under the agreement, and that, unless restrained by injunction, he would continue to harass the company with fraudulent claims against which the company could not defend. But the court refused to entertain the suit, and, in the course of its opinion, page 302 of 162 F., said: "The cancellation of written instruments is one of the recognized grounds of equitable jurisdiction which does not depend upon the inadequacy of the legal remedy, but courts of equity will in general refuse to exercise the jurisdiction when the legal remedy by action or defense is plain, adequate, and complete. Insurance Co. v. Bailey, 13 Wall. 616, 20 L. Ed. 501; Grand Chute v. Winegar, 15 Wall. 373, 21 L. Ed. 174. Thus the jurisdiction will be sustained in cases where the instrument has been obtained by fraud, and is a cloud upon title, or where the instrument is negotiable and the putting it into circulation would be a fraudulent act, or where there is danger of loss of evidence which constitutes the defense if the adverse party delays his action. But the jurisdiction will not be exercised in a suit to cancel a non-negotiable instrument to which defense may be made in an action at law thereon, unless particular facts are alleged which show that such a defense will be inadequate. The decided weight of authority is that the mere ordinary danger of losing evidence to establish the defense, even where no action at law has as yet been brought upon the instrument, is not of itself sufficient to sustain the jurisdiction. In the present case we have the admission of both the parties to the suit that an action is now pending, in which an immediate determination of the question in controversy may be had." We adopt the principle announced in the aforegoing case as directly applicable to the present suit.

By way of further attempting to distinguish the present suit from the various types of cases to which reference has been made and in which equitable relief has been denied, plaintiff asserts that because the contract, according to its terms, is a continuing one during every moment of its existence, additional liability accrues and will continue to accrue for the next thirty-five years, unless the contract is canceled. However, this is merely begging the question, and is but a restatement of the remaining major argument advanced by plaintiff to the effect that, if this court does not assume jurisdiction and grant the relief asked, namely, declare the contract null and void, and enjoin the defendant from taking any proceedings thereunder, plaintiff's credit will be seriously prejudiced in its relations with its creditors. But plaintiff is met at once with the well-established equitable principle that the impairment of credit is not sufficient ground for the granting of equitable relief. We have been referred to no case, nor have we found any, which is contrary to this principle. Numerous cases cited by plaintiff in support of a contrary view have already been analyzed in connection with plaintiff's closely related argument that its remedy at law is not adequate because made to depend upon the will of defendant, and such cases are all so distinctly different on their facts from the present suit as to require no further consideration. The same may be said with respect to the remaining cases relied upon by plaintiff, in an effort to show that impairment of credit is a well-recognized ground for equitable relief in a case of this kind.

As admitted by defendant, it may very well be that the making of a legal demand may injure the financial strength of the plaintiff and even seriously impair its business, but, as defendant points out, these things are inherent in the assertion of any large claim, and if, as here, such claim is made in good

faith, a court of equity has no power to intervene. The bill contains no allegation that defendant has acted, or is now acting, in bad faith, nor does it charge that defendant has maligned or attempted to malign plaintiff's credit. "Where a party, if his theory of the controversy is correct, has a good defense at law to 'a purely legal demand,' he should be left to that means of defence, as he has no occasion to resort to a court of equity for relief, unless he is prepared to allege and prove some special circumstances to show that he may suffer irreparable injury if he is denied a preventive remedy." Phoenix Mut. L. Ins. Co. v. Bailey, 13 Wall. 616, 623, 20 L. Ed. 501. In concluding, as we do, that the plaintiff has failed to satisfy the court that it may suffer irreparable injury if denied a preventive remedy, it is important to note, as did the Supreme Court in the Bailey Case just referred to, that we cannot blink the fact that an action at law has since been commenced, albeit, as already explained, such a circumstance is not to be taken as conclusive of the lack of equitable remedy.

Finally, there is no merit in plaintiff's contention that it should not be turned away from this court and required to plead its defense of claims or counterclaims in a suit subsequently commenced by defendant in another jurisdiction, because, as plaintiff contends, in any suit at law brought by defendant to recover damages from plaintiff for alleged breach of the contract, plaintiff's claim that the contract is invalid ab initio, or that it never existed or has been abrogated, will be set up as an equitable defense, counterclaim, or cross-bill, and that the issue created thereby would have to be tried as a suit in equity by the court sitting without a jury, prior to the trial by the jury of the issues raised by defendant's suit. This is but another way of saying that plaintiff's alleged defenses are equitable defenses and not available at law. This argument has already been completely refuted. An examination of the cases to which the court has been referred by plaintiff in support of its contention indicates at once that these cases do not support plaintiff, because dealing with distinctly different causes of action.

In conclusion, therefore, the court finds it has no jurisdiction to entertain the present bill because it fails to state a cause of action cognizable in equity, and thus it becomes unnecessary to consider (1) whether the present controversy does in fact involve any question as to the effect of the Interstate Commerce Act, or the Fuel Control Act, or the Railroad Control Act, or all three, upon the contract in question, namely, an interpretation of any or all of these statutes; and (2) whether plaintiff has been guilty of laches such as might require dismissal of the bill if the court had had jurisdiction to entertain it. Accordingly defendant's motion must be granted and the bill dismissed.